BECKER, Collector of Internal Revenue, v. ANHEUSER-BUSCH, Inc., and twenty other cases.

Nos. 11816 to 11836.

Circuit Court of Appeals, Eighth Circuit.

May 29, 1941.

Rehearing Denied June 23, 1941.

404

Paul R. Russell, Sp. Asst. to Atty. Gen., (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., Harry C. Blanton, U. S. Atty., of Sikeston, Mo., and Herbert H. Freer, Asst. U. S. Atty., of St. Louis, Mo., on the brief), for Louis J. Becker, Collector of Internal Revenue, etc.

Harry W. Kroeger, of St. Louis, Mo. (Daniel N. Kirby, of St. Louis, Mo., on the brief), for taxpayers.

Before WOODROUGH, JOHNSEN, and VAN VALKENBURGH, Circuit Judges.

WOODROUGH, Circuit Judge.

The plaintiffs in these civil actions alleged that the Commissioner of Internal

Revenue had erroneously disallowed deductions claimed in consolidated income tax returns of Anheuser-Busch, Inc. (1875), its successor, Anheuser-Busch, Inc. (1925), and their affiliated subsidiary corporations, for the year 1924 and the year 1925, and claims for refund having been denied, they sued to recover tax payments attributable to the wrongful refusal to allow the deductions. Issues were joined and, jury being waived, the cases were tried to the court. The court made findings of fact, amended and additional findings of fact and conclusions of law, and without formal opinion entered judgments in favor of the taxpayers amounting to $123,179.46, from which the Collector has appealed. There are also appeals and cross-appeals by the taxpayers.

Allegations made in the petitions of the plaintiffs include the following:

"The Obsolescence Charge-Offs.

"On its said consolidated income tax return for itself and its subsidiaries for the year 1924, said Anheuser-Busch, Incorporated (1875), had taken a deduction against the consolidated income of the affiliated group for the year 1924 in the amount of $1,381,451.31 claimed for obsolescence of Bevo cases and the bottles abandoned in the year 1924, said amount being derived by said Anheuser-Busch, Incorporated (1875), and appearing on its books as follows, to-wit:

| | | |
|---|---|---|
| 749,897 two dozen 10 oz. 'Bevo' cases became obsolete and were abandoned in 1924—(cost to taxpayer) | | $ 772,393.91 |
| 3,271,160 dozen 10-oz. 'Bevo' bottles became obsolete and were abandoned in 1924—(cost to taxpayer) | | 885,096.95 |
| Total | | $1,657,490.86 |
| Less their junk value | $201,051.85 | |
| Less depreciation theretofore written off | 74,987.70 | |
| | $276,039.55 | 276,039.55 |
| Net Amount Deducted—Loss | | $1,381,451.31 |

"On its consolidated income tax return for said Anheuser-Busch, Incorporated (1875), itself and its subsidiaries for the year 1925, plaintiff, Anheuser-Busch, Incorporated (1925), had taken a deduction against the consolidated income of said affiliated group for the year 1925 in the amount of $98,586.16 claimed for obsolescence of Bevo cases and bottles abandoned at the end of the year 1925, said amount being derived by plaintiff, Anheuser-Busch, Incorporated (1925), and appearing on its books, as follows:

| | | |
|---|---|---|
| 409,071 dozen 10 oz. bottles—Obsolete | | $119,039.66 |
| Less junk value at 5¢ per doz. | | 20,453.50 |
| | | $98,586.16 |

"Said deductions by Anheuser-Busch, Incorporated (1875), and plaintiff, Anheuser-Busch, Incorporated (1925), arose out of the following facts:

"Anheuser-Busch, Incorporated (1875), was, for many years prior to January, 1920, the effective date of the ratification of the Eighteenth Amendment to the Federal Constitution, and prior to January 17, 1920, the effective date of the Volstead Act, in the business of manufacturing and selling beer having an alcoholic content. The immediate effect of said Eighteenth Amendment and Volstead Act was to completely destroy the said business that had been theretofore conducted by said Anheuser-Busch, Incorporated (1875). It thereupon pursued the policy of readjusting and changing the character of its products to comply with the law, and of adding new products for the purpose of utilizing its plant and equipment. Preparatory to the advent of National Prohibition, it had invented and begun to market a non-alcoholic cereal beverage named 'Bevo'. The initial demand for said Bevo was great, and in order to equip itself to meet the market for said product, it purchased large quantities of ten ounce bottles of a peculiar size and shape not adaptable to the marketing of other products. In 1919, it sold 3,904,016 dozen bottles of Bevo, and in 1920 it sold 3,044,006 dozen bottles of Bevo. Thereafter, however, its sales of said product dropped as follows:

| | |
|---|---|
| 1921—794,378 dozen | 1923—726,348 dozen |
| 1922—732,302 dozen | 1924—709,008 dozen |

"At the end of the year 1924, the officers of said Anheuser-Busch, Incorporated (1875), having ascertained from sustained experience that its case and bottle equipment for the distribution of Bevo, acquired at a time when there was reasonable expectation of increased sales of said product, had become grossly excessive in the light of the subsequent falling off of such sales, determined that, of the supplies of such cases and bottles on hand, said 749,897 cases and said 3,271,160 dozen bottles were incapable of further use in said business, or in any other business conducted by said Anheuser-Busch, Incorporated (1875), that they had no value, and that they had become obsolete in respect to said business, and ordered said cases and bottles to be abandoned, not further used in said busi-

ness, and sold as junk when reasonably possible. Thereafter, and pursuant to said order, said cases and bottles were physically set apart from all similar cases and bottles still used in the conduct of said business, or which were reserved for future use, and abandoned.

"In like manner, at the end of the year 1925, the officers of plaintiff, Anheuser-Busch, Incorporated (1925), having ascertained from sustained experience that its case and bottle equipment for the distribution of Bevo, acquired at a time when there was reasonable expectation of increased sales of said product, was still grossly excessive in the light of the subsequent falling off of such sales, determined that, of its supplies of such cases and bottles on hand, not only those which had been abandoned as aforesaid, in the year 1924, but also said 409,071 dozen ten ounce Bevo bottles above mentioned were incapable of further use in said business or in any other business conducted by plaintiff, Anheuser-Busch, Incorporated (1925), that they had no value, and that they had become obsolete in said business, and ordered said bottles to be abandoned, not further used in said business, and sold as junk when reasonably possible. Thereafter, and pursuant to said order, said cases and bottles were physically set apart from all similar cases and bottles still used in the conduct of said business or which were reserved for future use, and abandoned.

"None of said cases and bottles in respect to which said deduction for obsolescence was taken by said Anheuser-Busch, Incorporated (1875), and none of said bottles in respect of which said deduction for obsolescence was taken by plaintiff, Anheuser-Busch, Incorporated (1925), were in fact ever used by said Anheuser-Busch, Incorporated (1875), or plaintiff, Anheuser-Busch, Incorporated (1925), in the conduct of said business. The remaining bottles and cases reserved for future use proved adequate to satisfy all the subsequent demands incident to the manufacture and sale of Bevo. Quantities of said abandoned bottles were in fact sold or given away as junk realizing smaller amounts than said amounts assigned to them as junk value, and deducted from the respective amounts of said obsolescences. Said deduction taken on account of obsolescence of said cases and bottles in the year 1924 was a loss incurred in the conduct of the business of said Anheuser-Busch, Incorporated (1875),

such loss was sustained in the year 1924 when the cases and bottles were determined to be useless and in fact abandoned, and the amount thereof was properly deducted from the consolidated income of Anheuser-Busch, Incorporated (1875), and its subsidiaries on its return for said year. Said deduction taken on account of obsolescence of said bottles in 1925 was a loss incurred in the conduct of the business of plaintiff, Anheuser-Busch, Incorporated (1925), such loss was sustained in the year 1925 when the cases and bottles were determined to be useless and in fact abandoned, and the amount thereof was properly deducted from the consolidated income of plaintiff and its said subsidiaries on its return for said year."

Issues were joined upon these and other allegations by the answer of the Collector, and his position with reference to the deductions may be briefly indicated by an official letter relative to certain claims for refund wherein the taxpayer's representative was informed:

"You contend that a further deduction should be allowed this taxpayer for the years 1924 and 1925 as loss of useful value on 10-ounce Bevo cases and bottles which were set aside by the corporation in the years in question, due to the fact that bottles and cases on hand exceeded the requirements of the declining trade.

"In rejecting the claims, the Bureau took the position that until the investment in cases and bottles was converted into terms of money by sale or other final disposition, there was neither loss nor gain and the income of the company for the year was neither increased nor decreased.

"In order to be allowed as a deduction for loss of useful value, a taxpayer must prove that there has been a loss and that it was sustained during the taxable year. While it is stated that certain cases and bottles were set aside and loss on abandonment claimed, it is conceded that these bottles and cases were not finally disposed of and were available for use thereafter had the necessity arisen. These types of bottles and cases were in use by the company for Bevo and other products through the year 1933. Under the circumstances it is held that no deductible loss was sustained in the years 1924 and 1925."

The findings as amended and amplified by the District Court include the following:

"18. The chief business of Anheuser-Busch, Incorporated (1875), prior to the advent of National Prohibition, was the manufacture and sale of beer.

"19. Commencing in 1908, Anheuser-Busch, Incorporated, developed a product, Bevo, which was a malt beverage free from alcohol, manufactured by an arrested fermentation process, for the purpose of finding a market for a non-alcoholic beer-like beverage in local option territories and government reservations.

"20. Government regulations at that time and until 1916 required that near-beer be made on premises segregated from the premises upon which beer was made, and that it be marketed in packages unlike those ordinarily used for containing fermented liquor. Unless the product was made by a process under which at no time during manufacture more than one-half of one per cent of alcohol was contained therein, it was taxed as beer.

"21. Bevo was manufactured on a large scale in 1916 and reached peak production in 1918.

"22. For the purpose of marketing Bevo, Anheuser-Busch, Incorporated, during the years 1916 to 1919, both inclusive, acquired 2,899,774 Bevo cases at an aggregate cost of $2,731,332.48, and purchased or manufactured 666,066 gross of Bevo bottles at an aggregate cost of $1,794,023.49. The prices paid for the cases ranged from 85½¢ in 1916 to $1.03 in 1918. The prices for the bottles ranged from $2.40 per gross in 1916 to $3.85 per gross in 1918. The bottle adopted for the marketing was a ten-ounce bottle of unusual shape differing materially from the tall twelve-ounce bottle used for the marketing of beer. The Bevo cases were built to accommodate the shorter bottles.

"23. Sales of Bevo suffered drastic declines after 1918. From a volume of 10,-449,152 dozen bottles in 1918, sales fell to 3,904,316 dozen bottles in 1919. Sales fell again from 3,044,006 dozen bottles in 1920 to 794,378 dozen bottles in 1921.

"24. The immediate cause of the decline of sales of Bevo after 1918 was a change, the effect of which was then being experienced, in governmental regulations under which breweries were thenceforth permitted to produce near-beer by the manufacture of alcoholic beer and its subsequent de-alcoholization, and to market such near-beer in ordinary twelve-ounce beer bottles, the taxability of the near-beer being made to depend upon the alcoholic content at the time it was finished as distinguished from the alcoholic content during the process of manufacture. The quality of such de-alcoholized beer was better than that of Bevo, and competition required Anheuser-Busch, Incorporated, to introduce de-alcoholized Budweiser at the end of 1919 and to market it in beer bottles.

"25. Subsequently during the Prohibition period, sales of both Bevo and de-alcoholized Budweiser declined due to competition of illegal home-brewing.

"26. As a result of Prohibition, many breweries were compelled to cease business, but Anheuser-Busch, Incorporated, sought to employ its plant, capital and facilities in other industries, including the manufacture of non-alcoholic beverages, ice, ice-cream, corn products and yeast.

"27. At the time Bevo sales were made, only the liquid content was sold and deposits were taken for the return of the cases and bottles. As empty cases and bottles were returned, customers were given refunds at the rate of the deposits charged.

"28. Consequent upon the falling off of Bevo sales after 1918, the returns of Bevo cases and bottles exceeded the shipments, and a gradual accumulation of Bevo cases and bottles, requiring storage, took place.

"29. In the years 1920 to 1923, Bevo cases and bottles accumulated were held for use in the marketing of other beverages. Of such other beverages, the production of Ginger Ale was commenced in 1921, of Grape Bouquet and Grape Concentrate in 1922, and of Carcho in 1923. These products were marketed in Bevo cases and bottles.

"30. At the time of the introduction of Ginger Ale, Grape Bouquet, Grape Concentrate and Carcho, there was no way in which the volume of production thereof, and the requirements of cases and bottles therefor, could be anticipated.

"31. Until the end of 1923, because of the reservation of the equipment for the marketing of other products, no effort was made by the management to sell supplies of empty cases and bottles excepting at prices comparing favorably with their costs or in instances where there were supplies of bottles without cases, the cases having been converted into beer cases.

"32. In 1923, Anheuser-Busch, Incorporated, was forced by competition to give

up using Bevo bottles for the purposes of marketing Ginger Ale and was compelled to adopt a different bottle for that purpose.

"33. In 1924, after three years experience in the marketing of Grape Bouquet and Grape Concentrate and two years experience in the marketing of Carcho, the results from these products were disappointing, the total volume of sales of Bevo and of said new products not exceeding 12½% of the peak volume of Bevo sales in 1918.

"34. Beginning in December, 1923, efforts were made to sell empty Bevo cases and bottles, such efforts being without success, even when the offering price of $1.00 per case with two dozen bottles in each, fixed on December 18, 1923, was on April 15, 1924, reduced to 35¢ per case including two dozen bottles in each.

"35. At the end of 1924, the executive officers of Anheuser-Busch, Incorporated, determined that 749,897 two-dozen ten-ounce Bevo cases which had cost $772,393.91 and 3,271,160 dozen Bevo bottles which had cost $885,096.95, were no longer required for the business of the corporation and that they had in said year become obsolete and had lost their useful value, and directed that the depreciated cost of such cases and bottles, less their remaining junk value, should be charged off on the books of the corporation as of December 31, 1924.

"36. As of December 31, 1924, the total cost of said cases and bottles, namely $1,657,490.86, less the amount of the junk value thereof, $201,051.85, and depreciation theretofore written off on the cases in the amount of $74,987.70, making a net loss of $1,381,451.31, was charged off on the books of the corporation.

"37. The determination of the executive officers of Anheuser-Busch, Incorporated, that the cases and bottles which were the subject matter of the write-off at the end of 1924 had become obsolete and had lost their useful value in that year, after the failure of the products for the marketing of which they were reserved, was reasonable, and said cases and bottles had in fact become obsolete and lost their useful value in 1924.

"38. At the end of 1925 the volume of shipments of products moving in Bevo bottles having shown a further decline, the supply of cases and bottles reserved for use, after the withdrawal from use of the cases and bottles which were the subject matter of the 1924 write-off, still remained greatly excessive.

"39. At the end of 1925 the executive officers of Anheuser-Busch, Incorporated, determined that 409,071 dozen Bevo bottles which had cost $119,039.66, in addition to those which were the subject matter of the write-off in 1924, were no longer required for the business of the corporation and that they had in 1925 become obsolete and had lost their useful value, and directed that the cost of such bottles, less their remaining junk value, should be charged off on the books of the corporation as of December 31, 1925.

"40. As of December 31, 1925, the cost of said bottles, $119,039.66, less a junk value of $20,453.50, making a net loss of $98,586.16, was charged off on the books of the corporation.

"41. The determination of the executive officers of Anheuser-Busch, Incorporated, that such bottles had become obsolete and had lost their useful value in 1925, was reasonable, and said bottles had in fact become obsolete and lost their value in 1925.

"42. Of the total number of cases and bottles included in the write-offs of 1924 and 1925, about 10% were new cases and bottles and about 90% were used cases and bottles returned from the trade. As cases and bottles had been returned from the trade, they had been stored in unused parts of the Bevo building, a bottling plant, so far as available, then in other buildings, and finally in exposed places. All such cases and bottles were in sound and usable condition at the time they were stored and at the times of the write-offs.

"43. The costs assigned in said write-offs to the cases and bottles constituting their subject matters fairly reflected their actual costs.

"44. The junk values assigned in the write-offs to said cases and bottles fairly represented their realizable values at the respective dates of the write-offs and were adequate.

"45. No physical deterioration can be attributed to glass bottles in storage and undisturbed, through aging or exposure for a period of not exceeding four years. Annual allowances for shrinkage in stocks of bottles are properly based upon breakage, abrasion and loss in the process of manufacture and in the hands of the trade, and

have no relation to bottles in storage. Therefore, it was proper, in making said write-offs, not to reduce the cost of the bottles by a depreciation or deterioration factor.

"46. Wooden boxes are subject to depreciation through aging and exposure, but at a rate not in excess of that applied in computing the depreciation allowances against the cost of the cases charged off at the end of 1924.

"47. The cases and bottles which were the subject matter of the write-offs were in storage at locations where they were not readily accessible to the production facilities of Anheuser-Busch, Incorporated, and could not be used excepting upon incurrence of expense in hauling.

"48. The cases and bottles which were the subject matters of the write-off of 1924 were discarded and abandoned in 1924, and the bottles which were the subject matter of the write-off of 1925 were discarded and abandoned in 1925.

"49. None of the cases and bottles which were the subject matter of the write-offs of 1924 and 1925 were ever used subsequently in the business of the corporation excepting to the extent of one carload of bottles used for experimental purposes.

"50. The Bevo cases and bottles which were reserved for use at the end of 1924 and at the end of 1925 (exclusive of those which were the subject matters of the write-offs at the end of those years) were adequate to accommodate the volume of trade in all products of Anheuser-Busch, Incorporated, marketed in Bevo bottles.

"51. The total amount realized from sales of cases and bottles which were the subject matter of the write-offs of 1924 and 1925 was $142,123.55, compared with junk values in the aggregate amount of $221,505.35 deducted from their costs at the time of the write-offs.

"52. The cases and bottles which were the subject matter of the write-offs of 1924 and 1925 were not readily salable because they were specially made and of a size and shape not generally used, and were not marketable excepting in small quantities and at sacrifice prices.

"53. Anheuser-Busch, Incorporated, under the circumstances above stated, sustained a deductible loss in the year 1924 in the amount of $1,381,451.31 and a deductible loss in the year 1925 in the amount of $98,586.16, which said losses were erroneously disallowed by the Commissioner of Internal Revenue."

"II. The consolidated income tax returns filed on behalf of Anheuser-Busch, Inc.(1875), and its subsidiary corporations for the calendar years 1918 to 1921, inclusive, reported consolidated net incomes or net losses as follows:

| Year | Income or Loss | | | Amount |
|---|---|---|---|---|
| 1918 | Consolidated Income Reported | | | $ 195,782.20 |
| 1919 | " | Loss | " | $2,490,356.04 |
| 1920 | " | " | " | $1,902,327.07 |
| 1921 | " | " | " | $1,244,805.94 |

"III. In arriving at the net loss of $816,-105.95 reported for the affiliated group of corporations for 1924, the obsolescence loss of $1,381,451.31 was claimed among the deductions. Although the income tax returns for 1925 and 1926 reported net incomes for each year, no tax liability was shown in either return for the reason that operating losses of prior years were claimed as deductions in amounts sufficient to offset the incomes reported."

"VII. It was the practice of Anheuser-Busch, Inc. (1875), and of its successor to take physical inventories of all of the companies' supplies and equipment on hand in each department at the close of each calendar year. In addition to the detailed inventory sheets, summary sheets were prepared listing the totals of the various items. A comparison of the inventories of cases and bottles reveals that the wooden cases and amber bottles in which 'Bevo' was marketed had accumulated at the plant in large quantities prior to December 31, 1920, increasing in number until December 31, 1921, after which the quantities remained approximately the same from 1922 to 1926, inclusive. The Bevo cases were consistently inventoried at the redemption price of 50 cents fixed in dealings in the trade, and the Bevo bottles were likewise consistently inventoried at the redemption price of 20 cents per dozen. The respective totals shown in the inventories from December 31, 1920, to December 31, 1926, are shown with respect to the cases and bottles as follows:

| Inventory | Quantity | Inventory Value |
|---|---|---|
| 12-31-20 | 827,631 | $413,815.50 |
| | 3,751,196-5/12 | 750,239.28 |
| 12-31-21 | 1,151,383 | 575,691.50 |
| | 4,329,853-11/12 | 865,970.78 |
| 12-31-22 | 1,139,064 | 569,532.00 |
| | 4,119,125-10/12 | 823,825.17 |

| Inventory | Quantity | Inventory Value |
|---|---|---|
| 12-31-23 | 1,133,777 | 566,888.50 |
| | 4,383,547-9/12 | 876,709.55 |
| 12-31-24 | 1,142,694 | 571,347.00 |
| | 4,126,196-4/12 | 825,239.27 |
| 12-31-25 | 1,152,158 | 576,079.00 |
| | 4,093,554-6/12 | 818,710.90 |
| 12-31-26 | 1,118,355 | 559,177.50 |
| | 3,806,356-10/12 | 761,271.37 |

"Said quantities did not include cases and bottles in the hands of the trade.

"Said inventory sheets were not the basis of an asset account and the figures therein were not entered on the books of account.

"The sheets were memoranda of the cases and bottles on the premises, and no consideration was given therein to the use or usefulness of the things included in the lists.

"VIII. The various lots of cases and bottles charged off as of December 31, 1924, and as of December 31, 1925, have not been identified as a part of any particular purchases or part of any particular lots manufactured by the company, and their exact cost has not been established, with the exception that 845,704 dozen unused bottles charged off as of December 31, 1924, have been identified as bottles manufactured at the company's own plant."

"X. The company continued to experiment for the purpose of developing new products and beverages. In 1922 and 1923 it developed and placed on the market several beverages with the hope of making use of its Bevo cases and bottles. After 1924 it placed on the market several medicinal products marketed in Bevo bottles but not expected to sell in great volume. The paper hereto attached marked Exhibit 3 contains a correct summary of all products, and the quantities thereof, moving in Bevo bottles from the years 1916 to October 1, 1933, both inclusive.

"XI. In May or June of 1925, both the 10-ounce bottles and the 12-ounce bottles which had been stored in sheds and bins were tested in the bottling plant under the supervision of Mr. Upshaw about thirty days after he accepted employment with the company. These tests demonstrated that the bottles would not stand the pasteurization process, the breakage being as high as 40%. In the experiment with respect to Bevo bottles, 3,600 dozen or approximately 1 car load were thus tested.

"XII. The cases and bottles upon which plaintiffs claim obsolescence deductions for 1924, and 1925 were neither removed from the various locations where they had been stored, nor were they destroyed, sold or disposed of during 1924 and 1925. Anheuser-Busch, Inc. (1925), continued in ownership and possession of said surplus cases and bottles after said years and until they were ultimately sold, discarded, destroyed by fire, or otherwise disposed of. The schedule hereto attached contains a correct summary of the various lots of bottles and the character of the locations in which they were stored. (Schedule 4.)"

"XV. The evidence fails to disclose the depreciation and obsolescence sustained during previous years, the amounts charged off, or the amounts allowed by the Commissioner upon the particular equipment in controversy, but the evidence shows that depreciation was written off on all ten ounce cases and bottles: for the years 1916 and 1917, no depreciation; for the years 1918 and 1919 and the first seven months of 1920, 3.4¢ per case and 1¢ per dozen bottles shipped; and for the last five months of 1920, and the years 1921 to 1924, both inclusive, 5¢ per case and 2¢ per dozen bottles shipped. In Plaintiffs' computation of its loss in 1924, the provision for depreciation sustained on the cases which were the subject matter of the write-off was $74,987.70. This depreciation was based on an estimate of 10¢ per case, upon the assumption that all of the 749,877 cases made an average of two trips before they were stored, and that each case depreciated 5¢ in value as a result of each trip.

"XVI. Although the 1924 entry charging off the Bevo cases and bottles was dated December 31, 1924, the ascertainment of the amounts to be charged off was not made until the latter part of January, 1925. On January 21, 1925, Mr. Doerr reported concerning the condition and saleability of the cases and bottles to Mr. Russell, then in charge of the Accounting Department, who in turn consulted Vice-President Huber. Upon the instructions of Mr. Huber, Mr. Degler, acting in consultation with Mr. Henzenworth, Superintendent of the Bevo plant, selected the quantities and amounts of cases and bottles to be written off, charging off those items which were most remote and inaccessible. Mr. Huber and Mr. Russell then approved the detail of the charge-off on the books. Such charge-off was made as part of the regular closing of the books for 1924. No general

instructions were given to the employees of the company to refrain from using the cases and bottles written off, but there was no need for its use. There was nothing to prevent the use of the equipment at any time had there been a sudden increased demand for any beverage or product for which they were adapted.

"XVII. Although the Commissioner of Internal Revenue denied the deductions claimed for 1924 and 1925 with respect to the particular Bevo cases and bottles, the subject of this litigation, he did allow substantial deductions from income in each of said years for depreciation accrued and losses sustained upon the case and bottle account as a whole. The Bevo cases and bottles were not segregated and entered upon the books of account as a separate asset classification, but were carried in one account together with all other types of cases and bottles, and the depreciation deductions claimed in the returns for the various years were not classified as to the different kinds of cases and bottles.

"XVIII. The income tax returns filed failed to show how much of the depreciation claimed applied to the 10-ounce Bevo cases and bottles and how much applied to other similar equipment in the Case and Bottle Account."

The conclusions of law include the following:

"2. Under the facts and circumstances presented by the evidence, Anheuser-Busch, Incorporated, sustained a loss in the amount of $1,381,451.31 on account of obsolescence of the Bevo cases and bottles which were the subject matter of the December 31, 1924, write-off. Such loss occurred in the year 1924, when the cases and bottles became obsolete, and Anheuser-Busch, Incorporated, was entitled under Subsection (a) (7) of Section 234 of the Revenue Act of 1924 to deduct the amount of such loss from its taxable income for 1924.

"3. Under the facts and circumstances presented by the evidence, Anheuser-Busch, Incorporated, sustained a loss in the amount of $1,381,451.31 on account of loss of useful value of the Bevo cases and bottles which were the subject matter of the December 31, 1924, write-off. Such loss occurred in the year 1924, when the cases and bottles lost their useful value, and Anheuser-Busch, Incorporated, was entitled under the provisions of Subsection (a) (4) of Section 234 of the Revenue Act

of 1924, to deduct the amount of such loss from its taxable income for 1924.

"4. Under the facts and circumstances presented by the evidence, Anheuser-Busch, Incorporated, sustained a loss in the amount of $98,586.16 on account of obsolescence of the Bevo bottles which were the subject matter of the December 31, 1925, write-off. Such loss occurred in the year 1925, when the bottles became obsolete, and Anheuser-Busch, Incorporated, was entitled under Subsection (a) (7) of Section 234 of the Revenue Act of 1924, to deduct the amount of such loss from its taxable income for 1925.

"5. Under the facts and circumstances presented by the evidence, Anheuser-Busch, Incorporated, sustained a loss in the amount of $98,586.16 on account of loss of useful value of the Bevo bottles which were the subject matter of the December 31, 1925 write-off. Such loss occurred in the year 1925, when the bottles lost their useful value, and Anheuser-Busch, Incorporated, was entitled under the provisions of Subsection (a) (4) of Section 234 of the Revenue Act of 1924, to deduct the amount of such loss from its taxable income for 1925."

Many of the facts were stipulated and there was practically no contradiction of witnesses, but the testimony is voluminous and we deem it unnecessary to set out all the particulars of testimony stressed by opposing counsel which have been considered.

### Opinion.

The first two points argued by the appcollector for reversal are that:

1. The deductions in controversy, relating to certain Bevo cases and bottles, do not constitute obsolescence within the meaning of Section 234(a) (7) of the Revenue Act of 1924 and 1926, 26 U.S.C.A. Int.Rev.Acts, pages 40, 187, and the applicable Treasury Regulations, and,

2. The deductions are not allowable as losses sustained within the meaning of Section 234(a) (4) of the Revenue Acts of 1924 and 1926, 26 U.S.C.A. Int.Rev.Acts, pages 40, 186, and the applicable Treasury Regulations, in that the cases and bottles did not become obsolete or lose their useful value in those years.

It is contended for the taxpayers in answer to both these points that the trial court has made its findings on the evidence in reference to the cases and bottles

charged off as of December 31, 1924, that "said cases and bottles had in fact become obsolete and lost their useful value in 1924", and in reference to the bottles charged off as of December 31, 1925, that "said bottles had in fact become obsolete and lost their useful value in 1925." And it is insisted that this court is bound by the finding of the District Court and that the inquiry whether there was deductible obsolescence or loss of value within the meaning of the Acts is precluded by the findings.

■ But although the declarations of the court that the cases and bottles had become obsolete and lost their useful value in 1924 and in 1925 were put in the form of findings of fact (the same declarations were also made by it as conclusions of law 2, 3, 4 and 5, supra), they are essentially conclusions of law, or at least determination of mixed law and fact. They mean that as the court interpreted the relevant Revenue Acts and Treasury Regulations, the facts disclosed by the evidence and found by it in its special findings satisfied the legal requirements for deductions for obsolescence and loss of value. Review of such ultimate and legal conclusions is not foreclosed by the mere form of declaration adopted by the court, Bogardus v. Commissioner, 302 U.S. 34, 39, 58 S.Ct. 61, 82 L. Ed. 32; United States v. Anderson, 7 Cir., 108 F.2d 475, but our obligation to pass upon the questions of law remains.

■ It is also contended for the taxpayers that the facts shown by the evidence and found by the District Court present a situation in respect to the Bevo cases and bottles which were the subject of the claimed deductions where the deductions were allowable under both Section 234(a) (7) and Section 234(a) (4) in that there was at the same time the "obsolescence" required by (7) and the "loss of value" required by (4). The applications for refund were sufficiently broad to permit suit for recovery on that basis and it is evident that the judgment was rested upon it. But it is made very clear by the recent decision of the Supreme Court in Real Estate Title Co. v. United States, 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542, that (7) and (4) are intended to define different grounds for the allowance of deduction and unless the facts bring the taxpayer within one or the other no deduction may be allowed. Furthermore, the separate Treasury Regulations having the force of law which have been promulgated to effectuate the object of each of the provisions must be taken into account in determining which, if either, provision is met by the taxpayer and such regulations sharpen and clarify the fundamental differences between the respective provisions.

■■ Turning to Collector's first contention, that obsolescence was not shown within the meaning of Section 234(a) (7), the provision authorizes corporations in computing their taxable net income to deduct "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence". It contemplates that the annual depreciation deductions shall take into consideration both the physical life of property and its useful life. As stated in United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 610, 71 L.Ed. 1054, "depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost." The applicable Regulations are 65, Articles 161 and 165 (1924 identical 1926 Tr.R. 69). Article 161 provides that "a reasonable allowance for exhaustion, wear and tear and obsolescence of property used in trade or business may be deducted from gross income" and that "for convenience such an allowance will usually be referred to as depreciation, excluding from the term any idea of a mere reduction in market value not resulting from exhaustion, wear and tear or obsolescence." "The proper allowance for such depreciation of any property used in trade or business is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the property in the business, equal the basis of property determined in accordance with Section 204 and Articles 1591-1603 * * *".

Article 166 reads as follows: "Obsolescence.—With respect to physical property the whole or any portion of which is clearly shown by the taxpayer as being affected by economic conditions that will result in its being abandoned at a future date prior to the end of its normal useful life, so that depreciation deductions alone are insuffi-

cient to return the cost (or other basis) at the end of its economic term of usefulness, a reasonable deduction for obsolescence, in addition to depreciation, may be allowed in accordance with the facts obtaining with respect to each item of property concerning which a claim for obsolescence is made. No deduction for obsolescence will be permitted merely because, in the opinion of a taxpayer, the property may become obsolete at some later date. This allowance will be confined to such portion of the property on which obsolescence is definitely shown to be sustained and cannot be held applicable to an entire property unless all portions thereof are affected by the conditions to which obsolescence is found to be due."

No contention has been made that the regulations are invalid, and Article 166 is set forth and applied in Real Estate Title Company v. United States, supra. Such regulations generally have the force of law, and when as here the statute does not descend to minutiae, but has been reenacted in view of the regulations, the interpretation by officials charged with administration may not be disturbed except for weighty reasons, and we perceive none as to these regulations. Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457; Helvering v. Wilshire Oil Co., 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101; Helvering v. Reynolds Co., 306 U.S. 110, 115, 59 S.Ct. 423, 83 L.Ed. 536; Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52; Hadley Falls Trust Company v. United States, 1 Cir., 110 F.2d 887.

■ Bearing in mind that usually a sale or other disposition of property is necessary before gain or loss may be included in income, and that the deductions here involved rest upon the special circumstances claimed to bring them within the exceptions to the general rule, our inquiry, raised by Collector's first contention, is whether these relevant and particular requirements of the Articles and Regulations to justify the declarations for obsolescence have been met by the taxpayer. See Chicago & N. W. Ry. Co. v. Commissioner, 7 Cir., 114 F.2d 882.

It is argued for Collector that the depreciations charged off on the books, $1,-

381,451.31 in 1924 and $98,586.16 in 1925, were not computed "in accordance with any reasonably consistent plan" as required by Regulation 65, Article 161, and that they were excluded by the same regulation because they simply reflected the opinion of the corporation's agents and were a "mere reduction in market value not resulting from exhaustion, wear and tear, or obsolescence." Also that the equipment charged off was not used in the trade or business during the taxable years, as required by the statute and regulation, but had been excess or surplus for several prior years.

Relevant allegations of the petitions were to the effect that the officers of the taxpayers ascertained in 1924 and 1925 from sustained experience that its case and bottle equipment had become grossly excessive and incapable of further use in the business and obsolete in respect to said business, and that the officers had ordered them to be abandoned and sold, and that the equipment was set apart from similar equipment still used, and that it was abandoned. It is also alleged that the deductions claimed were losses sustained in 1924 and 1925 "when the cases and bottles were determined to be useless and in fact abandoned". They were not in fact discarded or abandoned during the tax years. Although it is stated in finding 48 that they were so discarded and abandoned, the finding is directly contradicted by the further finding that they were kept in the same storage locations where they had been kept in previous years (47); that sales were made out of the same stock (51); that they were used for the purpose of testing (X); that they were neither removed from the various locations where they had been stored nor destroyed, sold or disposed of during 1924 and 1925 (XII); that the taxpayer continued in ownership and possession of them (XII); that no instructions were given to employees to refrain from using them, and there was nothing to prevent the use of them at any time if need arose (XVI).

The sales of Bevo from 1916 to 1925 are shown in the table[1] and the amount of the equipment on hand was as shown in finding VII, supra.

[1] 1916—2,282,401 Doz. bottles
1917—7,053,812 " "
1918—10,449,152 " "
1919—3,904,316 " "
1920—3,044,006 " "
1921—794,378 " "
1922—732,302 " "
1923—726,348 " "
1924—709,008 " "
1925—721,848 " "

It is fully disclosed in the findings that the taxpayer's Bevo business had not experienced any sudden decline in the tax years in question. Started in 1908, it reached its peak during war time prohibition in 1918, declined drastically in 1919, and in 1920 and 1921, from which time the sales fluctuated little until the end of 1925. The court found contributing causes of the decline in regulations that were established in 1916, two years before the mass of the equipment was acquired; in rising competition; in failure of prohibition enforcement; and finally the Bevo business was discontinued upon the repeal of prohibition. All of these were gradually operating factors except the last, and none of them operated to effect any great or definable obsolescence in the particular tax years in question. But the amount charged off in 1924, and claimed to be deductible, equalled at least 83⅓ per cent of the cost of the equipment, and the element of depreciation considered in the charge off was only $74,987.70, or roughly 4½ per cent of the cost, although the property was then about eight years old. The salvage value of $201,051.85, equalling about 12 per cent of the cost, together with the 4½ per cent and the 83⅓ per cent deducted, made up the total cost of the equipment. Neither the findings nor the evidence afford a substantial basis to conclude that there occurred in the tax years an obsolescence similar to ordinary depreciation equalling anything like 83⅓ per cent of the cost of the cases and bottles, and it is manifest that the charge off was made solely on the determination and direction of the officers of the corporation. It is very clear that continuously, from and after 1918, the Bevo equipment belonging to the taxpayer did suffer a large amount of what is referred to in Article 161 "for convenience" as "depreciation, including exhaustion, wear and tear and obsolescence", but it did not happen in the tax years 1924 or 1925. It was a continuous process and was extended over a course of years, and deductions in respect to it could only be computed and allowed in accordance with a reasonably consistent plan. We think that the only conclusion compatible with the facts specially found by the court and shown by the evidence, is that at the time the officers ordered the charge offs in 1924 and 1925, the basis for it was their determination that a mere reduction in market value had occurred in that there was a large excess of specially designed equipment on hand which by reason of the shrinkage of the business could not be used and was of small market value. It had not become obsolete in the relevant tax years but constituted surplus supplies similar to other cases and bottles still in use. Detroit & Windsor Ferry Co. v. Woodworth, 6 Cir., 115 F.2d 795. Their charge off was not in accordance with a reasonably consistent plan within the meaning of the regulation. Neither can it be said that the cases and bottles charged off were being used in the business in the tax years in question within the meaning of the regulation concerning obsolescence. That regulation includes within its scope only such property as is "used in the trade or business" in the taxable year for which deduction is claimed.

The manifest intendment of Section 234(a) (7), and the regulations promulgated pursuant thereto, was to authorize deductions similar to ordinary depreciation to cover gradual exhaustion, wear and tear, and obsolescence over a period of years, as distinguished from deductions for losses which were authorized by Section 234(a) (4). The regulation applicable to (4) is R. 65, Art. 143, later considered, but we note the stress laid in its first sentence upon the requirement of "sudden termination of the usefulness in the business of capital assets", in contrast to the language of Articles 161 and 166, respecting depreciation, including obsolescence, "the proper allowance * * which would be set aside in * * accordance with a reasonably consistent plan."

The recent decisions in United States v. Real Estate Title Company, 3 Cir., 102 F. 2d 582, affirmed in Real Estate Title Company v. United States, supra, were based upon Section 23(k) of the Revenue Act of 1928, and Treasury Regulation 74, Art. 206, which are identical with the Revenue Acts of 1924 and 1926 [234(a) (7)], and Treasury Regulation 166 here involved. Certain of the principles laid down are applicable here to the effect that the deductions can not be sustained under Section 234(a) (7).

It appeared in that case that the Title company, a Pennsylvania corporation, was formed in October, 1927, as a result of a statutory consolidation or merger of three companies. Two of the constituent companies owned title search plants which were among the assets acquired by the taxpayer as a result of the consolidation.

While it was known that two title plants would be acquired on the consolidation, there was at that time no definite plan for their disposition. But an immediate investigation was made and it was decided to store one of the plants in order to effect economies of operation. That was done substantially simultaneously with the consummation of the consolidation. About two months thereafter it was decided that the plant retained in use was adequate and that the one in storage would not be needed. Although for a brief period some slight use appears to have been made of the stored plant,[2] it was not kept up to date by the addition of current recordings. As a result it had only a salvage value by October 31, 1928. Meanwhile, negotiations for its sale had been unsuccessful. The petitioner in the action sought a refund of income taxes for the fiscal year ended October 31, 1928, based on the refusal of the Collector of Internal Revenue to allow a deduction for obsolescence of this plant. It had been carried on the books of the constituent company at $275,000 and was brought into the consolidation at $800,-000. The District Court, however, found that its value on March 1, 1913, was $1,-000,000; on October 31, 1928, $125,000—making an actual loss of $875,000, which that court allowed as a deduction for obsolescence for the taxable year 1928. It accordingly allowed a refund. That judgment was reversed by the Circuit Court of Appeals. 102 F.2d 582. The Supreme Court granted certiorari because of the asserted conflict of that decision with Crooks v. Kansas City Title & Trust Company, 8 Cir., 46 F.2d 928.

■ The Circuit Court of Appeals said [102 F.2d 584]:

"Deductions from gross income cannot be made for obsolescence or depreciation of property unless used in the trade or business of the taxpayer in the taxable year in question. The trial court reached the conclusion that the plant had been used by the appellee within the meaning of the statute. That use at most was very slight. Assuming, however, that the use by the appellee of the plant was sufficient to come within the purview of the statute, it then becomes necessary to determine whether or not the sum of $875,000 claimed by the appellee as deduction from its gross income

is a reasonable allowance for obsolescence and whether in fact there was obsolescence. * * *

"Obsolescence is always difficult to define. In Burnet v. Niagara Brewing Co., 282 U.S. 648, 653, 654, 51 S.Ct. 262, 264, 75 L.Ed. 594, Mr. Justice Butler, construing Section 234(a) (7) of the Revenue Act of 1918, 40 Stat. 1078, stated: 'The word is much used, and its meaning depends upon and varies with the connections in which it is employed. It has been said to be "the condition or process by which units gradually cease to be useful or profitable as a part of the property, on account of changed conditions." Obsolescence is not necessarily confined to particular elements or parts of a plant; the whole may become obsolete. Obsolescence may arise as the result of laws regulating or forbidding the particular use of the property as well as from changes in the art, the shifting of business centers, loss of trade, inadequacy, or other causes.' In United States Cartridge Co. v. United States, 284 U.S. 511, 516, 52 S.Ct. 243, 245, 76 L.Ed. 431, Mr. Justice Butler, construing the same section, stated: ' "Obsolescence" may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws, and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value.' In Gambrinus Brewery Co. v. Anderson, 282 U.S. 638, 645, 51 S.Ct. 260, 262, 75 L.Ed. 588, he stated again, referring to Section 234(a) (7): 'The statute contemplates annual allowance for obsolescence just as it does for exhaustion, wear, and tear. That is necessary in order to determine true gain or loss because postponement of deductions to cover obsolescence until the property involved became obsolete would distort annual income. It is well understood that exhaustion, wear, tear, or obsolescence cannot be accurately measured as it progresses and undoubtedly it was for that reason that the statute authorized "reasonable" allowances to cover them in order equally to spread that element of operating expenses through the years.'

"Obsolescence has been said to be ' * * the condition or process by which units

___

[2] Evidence of use subsequent to the consolidation or merger is quite tenuous, the only specific instances occurring immediately prior to the actual consummation of the consolidation on October 21, 1927.

gradually cease to be useful or profitable as a part of the property, on account of changed conditions * * *' and ' * * * the state or process of becoming obsolete'. Law of Federal Income Taxation, Paul & Mertens, Vol. 2, Section 20.110, citing First National Bank of Key West v. Commissioner, 26 B.T.A. 370. Obsolescence is not always subject to accurate measurement as it progresses. It was for this reason that the word 'reasonable' was inserted in the statute, permitting the losses occurring by reason of obsolescence to be spread over the years between the beginning and end of the process."

The Supreme Court [309 U.S. 13, 60 S. Ct. 372, 84 L.Ed. 542], in its affirming opinion, said:

"Now it is true that in the popular sense a thing which is obsolete is one which is no longer used, a meaning which gives color to petitioner's claim for deduction since there is no question that the title plant here involved is no longer utilized to any degree whatsoever. But the term 'allowance for obsolescence', as used in the Act and in the Treasury Regulations, has a narrower or more technical meaning than that derived from the common, dictionary definition of obsolete. The Treasury Regulations state the circumstances under which an allowance for obsolescence of physical property may be allowed, viz., where such property is 'being affected by economic conditions that will result in its being abandoned at a future date prior to the end of its normal useful life, so that depreciation deductions alone are insufficient to return the cost (or other basis) at the end of its economic term of usefulness.' * * * in general, obsolescence under the Act connotes functional depreciation, as it does in accounting and engineering terminology. More than non-use or disuse is necessary to establish it. * * * not every decision of management to abandon facilities or to discontinue their use gives rise to a claim for obsolescence. For obsolescence under the Act requires that the operative cause of the present or growing uselessness arise from external forces which make it desirable or imperative that the property be replaced. * * * "

Like considerations are applicable here. What had happened to the investment of the Real Estate Title company was substantially similar to the fate of the present taxpayer's investment in Bevo cases and bottles (except as the periods of use and disuse were much longer here). In both cases the conclusion is irresistible that the taxpayers had an excess and surplus of equipment. But there was not in either case a functional depreciation of the property in the tax year commensurate with the claimed deduction and it is explicitly declared by the Supreme Court that mere decision of management to abandon facilities or discontinue their use does not give rise to a claim for obsolescence.

It appears that the Title company's excess and surplus of equipment resulted from its having taken over substantially duplicated equipment, while the present taxpayer's surplus resulted from falling off of its business. But the reasons for denying deduction are similar. There was no obsolescence to the extent of the value of the excess property less salvage value within the tax year in either case and deduction on that basis could not be allowed. That does not mean that no deduction for depreciation, including obsolescence, was allowable. A reasonable deduction in respect to such of the property as was used in the trade or business during the tax years, computed in accordance with a reasonably consistent plan, would have been allowable in both cases—but such was not the nature of the deduction claimed either in the Real Estate Title case or here. See Detroit & Windsor Ferry Co. v. Woodworth, 6 Cir., 115 F.2d 795.

The taxpayers have cited as compelling a contrary conclusion, the following cases in which deductions were sustained: Gambrinus Brewery Co. v. Anderson, 282 U.S. 638, 51 S.Ct. 260, 75 L.Ed. 588; Burnet v. National Ind. Alcohol Co., Inc., 282 U.S. 646, 51 S.Ct. 265, 75 L.Ed. 592; Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, loc. cit. 654, 655, 656, 51 S.Ct. 262, 75 L.Ed. 594; United States Cartridge Co. v. United States, 284 U.S. 511, 52 S.Ct. 243, 76 L.Ed. 431; United States v. Wagner Elec. Mfg. Co., 8 Cir., 61 F.2d 204; Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, at 16, 18, 60 S.Ct. 371, 85 L.Ed. 542; Crooks v. Kansas City Title & Trust Co., 8 Cir., 46 F.2d 928; Plymouth Brewing Co. v. Commissioner, 16 B.T.A. 123; Moise v. Burnet, 9 Cir., 52 F.2d 1071.

Each of the cases cited presented the situation where identifiable and clearly defined events occurring in the tax years had rendered the taxpayer's property unfit and useless and obsolescence computed in accordance with a reasonably consistent plan

was found to be deductible. In the first three cases the cause was the imminent and then the actual advent of prohibition. In the next two there was the cessation of the state of war in 1918. Real Estate-Land Title & Trust Co. v. United States has been discussed. In Crooks v. Kansas City Title & Trust Co., there was obsolescence spread according to a reasonably consistent plan over nine and one-half years. In Plymouth Brewing Co. v. Commissioner, the property of the brewing company was rendered useless and to the extent indicated in the findings valueless during the taxable year by the operation of the Prohibition law. In Moise v. Burnet, the taxpayers were wholesale liquor dealers and were compelled to terminate their business and certain of their property was rendered useless and valueless by reason of the National Prohibition Act, 27 U.S.C.A. § 1 et seq. None of the cited cases appears to us to be in conflict with our foregoing conclusions. The first contention of the collector is sustained.

■ II. Turning to the second point argued for the collector, that the deductions are not allowable as losses sustained in the tax years within the meaning of Section 234(a) (4) of the Revenue Acts of 1924 and 1926 and applicable Treasury Regulations: Section 234(a) (4) authorizes deductions for losses sustained during the taxable year.[3]

We have noted the clear distinction to be observed between (7) and (4) of Section 234(a) to which attention was directed in Real Estate Title Co. v. United States, supra, and have referred to the first sentence of the Treasury Regulation applicable to (4). (65, Art. 143). We have also observed that unless justification for the deductions is found either in (7) or in (4) and the regulations respectively applicable, they may not be sustained.

Article 143 reads as follows: "Loss of Useful Value.—When, through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis and the salvage value of the property. In determining the amount of the loss, adjustment must be made, however, for improvements and for depreciation. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded, as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized. It does not apply to inventories or to other than capital assets. The exception applies to buildings only when they are permanently abandoned or permanently devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. Any loss to be deductible under this exception must be charged off on the books and fully explained in returns of income."

We are not persuaded that facts are either pleaded, shown or found to justify conclusion that there was "some change in business conditions" occurring in 1924 or 1925 through which "the usefulness of the capital assets (in question) was suddenly terminated" within the meaning of the first sentence of the regulation. The Bevo business requiring the use of the cases and bottles remained in those years about as it had been for several preceding years. As suggested by counsel, "the discouragement which resulted in charging the supplies off the books was induced by the opposite of change, in that the volume of sales in the Bevo cases and bottles remained at the same low level as before, making use of the surplus supplies unnecessary. Any change occurring in 1924 and 1925 constituted not a change in business conditions but a mere change in the optimism of company officials."

Nor did the deductions arise from the sudden termination of usefulness in the tax years. The usefulness had terminated long before and the equipment remained stored away as it long had been. Neither can it be said that anything was done in the tax years that amounted to permanently discarding the assets from use in the business. The court found in accord with

---

[3] Section 234(a) (4) of the Revenue Act of 1926 is identical.

■

418

the evidence that the employees were not given instructions to refrain from using the cases and bottles written off and there was nothing to prevent the use of the equipment at any time if use could be found for it.

It also clearly appears that such loss as accrued to the taxpayers on account of their investment (if there could be said to be a loss before the equipment was disposed of) was one resulting from gradual processes for which depreciation (including obsolescence) deductions were plainly authorized under (7) if they were spread over the years in accordance with a reasonably consistent plan.

None of the cases called to our attention appears to justify the deductions under (4) and the applicable Treasury Regulations on account of loss sustained in the tax years. The loss of the taxpayer's investment in cases and bottles occurred when they were finally disposed of, but not in 1924 or 1925. See International Educational Pub. Co. v. Commissioner, 3 Cir., 79 F.2d 343; Tennessee Con. Coal Co. v. Commissioner, 24 B.T.A. 369; Ewald Iron Co. v. Commissioner, 37 B.T.A. 798. The Collector's second contention is therefore sustained.

Other questions are extensively argued in the briefs, but the basis of plaintiffs' claims for refunds and suits was the alleged erroneous disallowance of the deductions, and our determination that the claimed deductions were not allowable under either of the provisions upon which the taxpayer must rely disposes of the controversy as presented by the appeals and cross appeals.

The judgments in favor of the plaintiffs below are reversed with directions to dismiss. The judgments against the plaintiffs below are affirmed.