**CARGILL, Inc., et al. v. UNITED STATES.**
**Civil Action No. 238.**

District Court, D. Delaware.

Sept. 12, 1942.

Albert G. Egermayer, of Minneapolis, Minn., and Hering, Morris, James & Hitchens, of Wilmington, Del., for plaintiffs.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and J. Leonard Lyons, Sp. Assts. to Atty. Gen., and Stewart Lynch, U. S. Atty., of Wilmington, Del., for defendant.

LEAHY, District Judge.

This is a suit for a refund of excess profits taxes for the year 1934 alleged to have been erroneously paid by plaintiff Warehouse Company.[1]

In August of 1934, Warehouse Company filed its capital stock tax return for the year ending June 30, 1934. In the belief that it was not doing business for the preceding taxable year,[2] it claimed exemption for the payment of the capital stock tax and stated its capital stock valuation as "none".

Warehouse Company's income and excess profits tax return for the calendar year 1934 reported a net income of $149,384.77 but showed no excess profits tax liability because—on its theory that it was not doing business prior to June 30, 1934, and was therefore not subject to the capital stock tax for the year ending on that date—it was likewise not subject to the excess profits tax.[3]

In filing its capital stock return for the year ending June 30, 1935, Warehouse Company purported to declare an original value

---

[1] For convenience, plaintiffs will be referred to as follows: Cargill, Incorporated, a Delaware corporation, as "Incorporated"; Cargill Elevator Company, a Minnesota corporation, as "Elevator Company"; and Cargill Warehouse Company, a Delaware corporation, as "Warehouse Company". Pursuant to a plan of reorganization, Warehouse Company was dissolved on December 7, 1936, and transferred all its assets to its sole stockholder, Elevator Company, which assumed all of Warehouse Company's liabilities. Subsequently, Elevator Company transferred its assets to Incorporated.

[2] Revenue Act of 1934, c. 277, 48 Stat. 680:

"§ 701. Capital Stock Tax

"(a) For each year ending June 30, beginning with the year ending June 30, 1934, there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1,000 of the adjusted declared value of its capital stock. * * *

"(c) The taxes imposed by this section shall not apply * * *

"(3) to any domestic corporation in respect of the year ending June 30, 1934, if it did not carry on or do business during a part of the period from the date of the enactment of this Act to June 30, 1934, both dates inclusive; * * *."
26 U.S.C.A.Int.Rev.Acts, page 787.

[3] Revenue Act of 1934, c. 277, 48 Stat. 680:

"§ 702. Excess-Profits Tax

"(a) There is hereby imposed upon the net income of every corporation, *for each income-tax taxable year ending after the close of the first year in respect of which it is taxable under section 701*, an excess-profits tax equivalent to 5 per centum of such portion of its net income for such income-tax taxable year as is in excess of 12½ per centum of the adjusted declared value of its capital stock * * *."
(Italics supplied) 26 U.S.C.A.Int.Rev. Acts, page 789.

of $3,000,000 and accordingly paid a capital stock tax in the amount of $3,000.

By letter dated January 24, 1936, the Commissioner of Internal Revenue advised Warehouse Company that its claim for exemption for 1934 was denied, and that it was bound by its declaration of "none" as its capital stock valuation. A deficiency totalling $9,368.62 was assessed on the 1934 income and paid under protest. The present suit is for refund of this amount.[4]

The sole issue in the case is whether Warehouse Company was "carrying on or doing business" prior to June 30, 1934, as those words are used in Section 701 of the Revenue Act of 1934.

Warehouse Company was incorporated on June 15, 1934. According to plaintiffs, the sole reason for its creation was to operate certain terminal grain warehouses in which was stored grain belonging to various Cargill companies and pledged to banks as security for loans. It was deemed advisable to divorce possession from ownership of the pledged property.

The first meeting of Warehouse Company was a meeting of the incorporators[5] in Wilmington, Delaware, on June 18, 1934. In conformity with Delaware law and corporate practice, by-laws were adopted, and a Board of Directors was elected and given authority to issue the entire authorized stock of 24,000 shares at par.

The directors held their first meeting in Minneapolis, Minnesota, on June 27, 1934. They went through the ritual required by Delaware law. They elected officers, provided for the opening of bank accounts in Minnesota and in New York City, and designated a principal office and resident agent in Wilmington, Delaware.

But ritual ended there. The directors proceeded to authorize establishment of offices in Marshall, Minnesota; Omaha, Nebraska; Superior, Wisconsin; Milwaukee, Wisconsin; Green Bay, Wisconsin; Chicago, Illinois; Buffalo, New York; Albany, New York; and Ogdensburg, New York. They then accepted the offer of Elevator Company to purchase the entire authorized issue of Warehouse Company stock—24,000 shares—at $100 par, payable in cash.

At the same meeting, the directors approved an offer to be made for the purchase from Elevator Company of the following assets: (1) Its elevators, along with their equipment and supplies, (2) all the shares of stock of Cargill Grain Company of Nebraska, Incorporated, and of Cargill Carriers, Incorporated, and (3) a claim against Cargill Grain Company of Nebraska. They also authorized an offer to purchase elevators, equipment and supplies from Cargill Grain Company for an amount equal to the value reflected on the books of Cargill Grain Company as of June 30, 1934. Payment for these properties was to be in cash, and Warehouse Company was to assume all outstanding grain receipts issued by the selling companies.

Elevator Company, in turn, held a special meeting of its board of directors on the same day—June 27, 1934. This board authorized the purchase of Warehouse Company's stock issue of 24,000 shares on the terms heretofore recited. At the same meeting, they also accepted Warehouse Company's offer to purchase the property referred to. Also, on the same day, the directors of Cargill Grain Company held a meeting and accepted the offer of Warehouse Company to purchase its property.

On the next day, Elevator Company delivered its check for $2,400,000 to Warehouse Company, and the Chase National Bank of New York City credited Warehouse Company's account with this amount on June 30, 1934. On June 30, 1934, Warehouse Company paid to Elevator Company and Cargill Grain Company $1,375,000 and $900,000 respectively, representing the purchase price of the assets bought from those companies. On the same day, it received a dividend of $68,674.78 from Cargill Grain Company of Nebraska, Incorporated.

If the functions of Warehouse Company from June 15 to June 30, 1934, as above disclosed, were confined to perfecting its corporate organization under the laws of Delaware, then it was not doing business, and no tax is due. But, if it had completed its period of legal gestation prior to July 1,

---

4 Minus an adjustment arising from the fact that a zero valuation as adjusted by adding paid-in capital and earnings ($2,-618,059.55) had to be used for 1935. A refund was accordingly made in the amount of $382, plus $35.63 interest.

5 In accordance with the fashion, the three incorporators were simply employees of one of the well-known charter companies who had handled the incorporation for the plaintiffs, and they obviously had no real contact with the newly formed company.

1934, and had actually entered into the world of business by that date, then the tax is due.[6]

It is agreed that Warehouse Company acquired the right to get title and possession of the properties purchased by reason of the transactions set out above, all of which took place between June 15 and June 30, 1934. Plaintiffs nevertheless deny that Warehouse Company was doing business because it had no personnel other than officers and directors. They contend that it had not yet entered into the field of activity for which it had been organized, since it had not as yet secured legal title to the property, assumed the outstanding grain receipts issued by Elevator Company and Cargill Grain Company, or taken any new grain into their elevators.

 The tax here involved is not a tax on income. It is, on the contrary, a tax on the exercise of corporate functions. An early Supreme Court case involving the question was Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 357, 55 L.Ed. 389, Ann.Cas.1912B, 1312. The Court sustained the corporation tax law under the Tariff Act of 1909 as a valid excise tax on doing business in the corporate form and said: "'Business' is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict., 158, citing People v. Commissioners of Taxes, 23 N.Y. 242, 244. 'That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit.' 1 Bouvier's Law Dictionary, p. 273." This broad definition has generally been followed in the cases, which have used it as the basis for a broad test of "doing business".[7] Indeed, the Supreme Court indicated its insistence upon such a test when it reversed a holding of the Circuit Court of Appeals for this Circuit in International Salt Co. v. Phillips, 3 Cir., 9 F.2d 389, that a holding company receiving and distributing dividends, endorsing notes of a company whose stock it owned, and purchasing bonds, was not doing business within the stock tax provisions of the Revenue Act of 1918. Phillips v. International Salt Company, 274 U.S. 718, 47 S.Ct. 589, 71 L.Ed. 1323. In a later case, Harmar Coal Co. v. Heiner, 3 Cir., 34 F.2d 725, 728, certiorari denied 280 U.S. 610, 50 S.Ct. 159, 74 L.Ed. 653, Judge Woolley suggested a test to determine whether a corporation was doing business. He said: "* * * a corporation, organized for a definite though limited business purpose involving profits, that pursues activities to carry out that purpose, no matter how few or small they may be, is carrying on or doing business within the meaning of the statute."

 The tax is not imposed upon the doing of a particular type of business.

---

[6] Treasury Regulations 64 (1934 Edition) contain the following on this subject:

"Art. 32. Application of the Tax.— The words 'carrying on or doing business' must be given their ordinary and natural significance. 'Business' is a very comprehensive term and embraces whatever occupies the time, attention or labor of men for the purpose of livelihood or profit. In other words, business necessarily involves the idea of the pursuit of gain. If a corporation was organized for profit and is doing what it was principally organized to do in order to realize profit, it is doing business. * * *

"Art. 33. 'Carrying on or doing business' illustrated.—* * * No particular amount of business is required in order to bring a company within the terms of the Act.

"A corporation may complete its organization and sell its capital stock for cash without incurring liability, but additional activities, such as entering into contracts for the purchase of property or construction of a plant, constitute the doing of business. In other words, it is not necessary that a company be actually engaged in manufacturing or that it be actually creating profit or gain to incur liability. Making contracts, buying materials or machinery, constructing buildings, employing and discharging individuals, are necessary business acts leading to the ultimate object of engaging in manufacturing.

"The letting of a contract and the construction of a hotel preparatory to engaging in the hotel business are sufficient activities to constitute doing business."

[7] Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460; Associated Furniture Corp. v. United States, Ct.Cl., 44 F.2d 78, certiorari denied 283 U.S. 830, 51 S.Ct. 364, 75 L.Ed. 1443; Blalock v. Georgia Ry. & Electric Co., 5 Cir., 228 F. 296, Ann.Cas.1917A, 679; Argonaut Cons. Mining Co. v. Anderson, 2 Cir., 52 F.2d 55, certiorari denied 284 U.S. 682, 52 S.Ct. 200, 76 L. Ed. 576; Page v. M. Rich & Bros. Co., 5 Cir., 99 F.2d 607, certiorari denied M. Rich & Bros. Co. v. First Nat. Bank, 306 U.S. 662, 59 S.Ct. 787, 83 L.Ed. 1059; Blair v. Wilson Syndicate Trust, 5 Cir., 39 F.2d 43; Associated Furniture Corp. v. United States, Ct.Cl., 44 F.2d 78, certiorari denied 283 U.S. 830, 51 S.Ct. 364, 75 L.Ed. 1443.

Hence, I reject the argument that Warehouse Company was not subject to the tax until it actually began the operation of the grain enterprises. Clearly, under the cases cited, it suffices that it exercised its charter power to purchase elevators and warehouses for handling grain by entering into contracts involving substantial sums; that it voted to establish nine branch offices in several States; and that it opened bank accounts in two different States with, in fact, a credit with one of the banks on June 30, 1934, in the amount of $2,400,000. I think a review of all the facts, as I have related them, compels the conclusion that Warehouse Company by June 30, 1934, had commenced its flight into the commercial field, and was operating under the profit motive. Tested by the rule pronounced by Judge Woolley in Harmer Coal Co. v. Heiner, supra, it was "doing business."

Plaintiffs rely on General Ribbon Mills v. Higgins, 2 Cir., 115 F.2d 472; Mode O'Day Corp. v. Rogan, D.C., 32 F.Supp. 571; and Nicholas v. Colorado Fuel & Iron Corp., 10 Cir., 112 F.2d 858, 860. These cases are obviously inapposite. In the General Ribbon Mills case, the company had completed its organization on June 17, 1936, but its object—the acquisition of the assets of other corporations to be paid for in stock— could not be accomplished before July 1, 1936, because the consent of the Commissioner of Corporations, required under California law before the stock could be issued, was not obtained until after June 30, 1936. The company involved in the Mode O'Day Corp. case simply issued its stock in exchange for stock in another company. Its object, the acquisition of assets of another corporation, was not attained until after June 30, 1937. The court held, and properly so, that the issuance of stock in exchange for stock was no different from the issuance of stock for cash which, under the regulations, is not considered "doing business". In the Colorado Fuel & Iron Corp. case, the court said: "Prior to July 1, 1936, no drafts or other evidences of indebtedness were given or received, no salaries or wages were paid to anyone. * * * No contracts were made and no operations of any kind were undertaken by the taxpayer."

In conclusion, it seems to me that the activities of Warehouse Company clearly constituted the "doing of business" under Article 33 of Treasury Regulations 64

(1934 Ed.).[8] The regulation in substantially identical language had appeared in numerous previous Treasury Regulations.[9]

The law, I believe, is now settled that substantial re-enactment of legislation which has been construed by Treasury regulations is at least strong evidence of legislative approval of such construction. It is presumed that Congress knew of the existing administrative interpretations of the statute. Brewster v. Gage, 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457; United States v. Safety Car Heating Co., 297 U.S. 88, 95, 56 S.Ct. 353, 80 L.Ed. 500; Lang v. Commissioner, 304 U.S. 264, 270, 58 S.Ct. 880, 82 L.Ed. 1331, 118 A.L.R. 319. In the recent case of Magruder v. Washington, Baltimore & Annapolis Realty Corp., 62 S.Ct. 922, 924, 86 L.Ed. ——, decided April 13, 1942, the lower court held that because a company was a liquidating corporation, it was not doing business within the meaning of the capital stock tax provisions, and hence the court refused to give effect to Article 43 (a) (5) of the Treasury Regulations 64 (1936 Ed.), which provided that the liquidation of property by sales from time to time and the distribution of the proceeds constitute the doing of business within the meaning of the statute. The Supreme Court, in reversing and finding tax liability, based its decision squarely on the regulation. The Court said: "Article 43(a) (5) is both a contemporary and a long standing administrative interpretation, having been in effect in substantially the same form since 1918, except for the period from 1926 to 1933 when the tax was not imposed. We are of opinion that it is valid, as well as applicable. The crucial words of the statute, 'carrying on or doing business', are not so easy of application to varying facts that they leave no room for administrative interpretation or elucidation. To be sure, in many, if not in most instances, the factual situation will be so extreme as to leave no doubt whether a corporation is doing business or not. But the nuances of facts between the two extremes have produced a nebulous field of confusion which has been recognized by courts striving to fit close cases into one category or the other. Interpretative regulations, such as Article 43(a) (5), are appropriate aids toward eliminating that confusion and uncertainty. Cf. Helvering v. Wilshire Oil Co., 308 U.S. 90, 102, 60 S.Ct. 18, 25, 84 L.Ed. 101; Tex-

---

8 See footnote 6.

9 Cf. Art. 5 of Treasury Regulations 64 (1922 Ed.) under the Revenue Act of 1921; Art. 12 of T.R. 64 (1924 Ed.) under the Revenue Act of 1924; Art. 22 of T.R. 64 (1933 Ed.) under the N.I.R.A.

tile Mills Securities Corp. v. Commissioner, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249." So too, Article 33, it seems to me, properly construes and is an aid in carrying out, the provisions of the statute. Acting under the Regulation, the Commissioner properly held Warehouse Company to be doing business within the meaning of the statute.

If counsel is of the opinion that the findings of fact and conclusions of law as set forth in this opinion are not sufficient to be in conformity with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, then they may submit their proposed findings.

The complaint should be dismissed, with costs.

