### CELANESE LANESE CORPORATION v. HIGGINS.

Civ. 32–361.

United States District Court
S. D. New York.

Sept. 12, 1949.

Shearman & Sterling & Wright, New York City, Charles C. Parlin, Paul R. Russell, Charles Goodwin, Jr., New York City, of counsel, for plaintiff.

John F. X. McGohey, U. S. Atty., New York City, James A. Devlin, New York City, of counsel, for defendant.

RIFKIND, District Judge.

Section 1200(a) of the Internal Revenue Code, as amended by § 301 of the Revenue Act of 1941, 26 U.S.C.A.Int.Rev.Acts, page 115, provided as follows: "(a) Domestic corporations.

"For each year ending June 30, beginning with the year ending June 30, 1939, there shall be imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1.25 for each $1,000 of the adjusted declared value of its capital stock."

The question presented by this suit is whether the plaintiff was "carrying on or doing business" during the year ending June 30, 1941, so as to be subject to the tax imposed by § 1200(a). The facts have been stipulated and show the following:

Plaintiff was organized under the laws of Delaware on May 9, 1941, as a wholly owned subsidiary of the Celanese Corporation of America, to manufacture and deal in cellulose products and, to that end, to acquire a manufacturing plant from King Cotton Mills Corporation. Between the date of organization and June 30, 1941, plaintiff took the following steps:

1. On May 9, 1941 a meeting of the encorporators was held at which by-laws were adopted, directors were elected and the issuance of corporate stock authorized.

2. On May 14, 1941, the first meeting of the board of directors was held at which officers were elected, the forms of stock certificate and seal were adopted, the Corporation Trust Company, as statutory agent, was directed to act under the direction of counsel for the corporation and the establishment of an office at 180 Madison Avenue, New York City, was authorized. The subscription of the parent corporation for 1,000 shares of stock at $100 a share was accepted. An offer was accepted from the Pabin Corporation to assign to the plaintiff a contract for the purchase from King Cotton Mills Corporation of its manufacturing plant at Burlington, North Carolina, for $125,000, which contract provided that, simultaneously with the delivery of the deed from the seller to the purchaser, the purchaser would lease the plant back to the seller for its continued possession until October 31, 1941. The Corporation was authorized to borrow, from its parent, funds necessary to complete the purchase of the plant; the officers were authorized to arrange to qualify the Corporation to do business in other states; the treasurer was authorized to pay all necessary organization expenses and to open a bank account.

3. Thereafter and before June 30, 1941, plaintiff did the following: It qualified to do business in North Carolina; it took title to the plant of the King Cotton Mills Corporation and executed a lease to the seller

for use thereof by the seller until October 31, 1941, without charge or rental other than its proportionate share of the real estate taxes, water charges and insurance; it borrowed $50,000 from the parent corporation; it opened a bank account wherein it deposited $100,000, the proceeds of the stock which it issued, and $50,000 the proceeds of the loan; it paid out $125,000 for the plant, $325 for title insurance and $110 for Federal stamp taxes on the stock; and it opened its books of account. Its offices in Delaware and North Carolina were actually the offices of the Corporation Trust Company, statutory agent in these two states. Neither at these offices nor at 180 Madison Avenue, which was the office of the parent corporation, was space set aside for the exclusive use of plaintiff. The stipulation further provides that "between May 9, 1941 and June 30th, 1941 both inclusive, plaintiff performed no other act of any kind, nature or description. It made no other purchases or contracts, had no employees, and paid no wages, salaries or directors' fees, had no regular books of account and no regularly constituted office or place of business, carried on no productive activity and maintained no operating organization, and received no income of any kind nor did any accrue."

The lease of the plant by plaintiff to the seller provided that King Cotton Mills Corporation would notify plaintiff if any machinery became idle by reason of the completion of the seller's unfinished orders and, if so, plaintiff had the right to require the seller to manufacture goods for the plaintiff on the idle equipment. It has been stipulated that at no time prior to July 1, 1941, did the seller manufacture any goods for the plaintiff's account. Plaintiff obtained possession of the plant on September 1, 1941.

What constitutes "doing business" under this section of the Revenue Act is a question which must be decided in each case "on its own facts." General Ribbon Mills v. Higgins, 2 Cir., 1940, 115 F.2d 472, 474.

It is plaintiff's contention that the steps taken by it did not constitute the doing of business, but were merely "incidental to the organization of the plaintiff, and prepara-

tory to 'carrying out the purpose of its organization,'" the manufacture of celanese yard. See General Ribbon Mills, Inc., v. Higgins, supra, 115 F.2d at page 474.

The relevant regulations are Articles 42 and 43 of Regulation 64 (1938 Ed.). Article 43(d) states inter alia as follows: "(2) A corporation may complete its organization and sell its capital stock for cash without incurring liability. However, the exchange of its capital stock for property other than cash or the use of the proceeds from the sale of its capital stock for the purchase of property are corporate business acts and constitute doing business. Entering into contracts for the purchase of property or the construction of a plant are also corporate acts and constitute doing business. In other words, it is not necessary that a corporation be actually engaged in the manufacture of its intended product or that it be actually creating profit or gain to incur liability, since making contracts, buying materials or machinery, and employing or discharging individuals are necessary business acts leading to the ultimate attainment of the objects and purposes for which the corporation was created and has its existence."

The language of the regulation embraces the facts of this case and subjects the plaintiff to liability unless the authorities construe it otherwise. I do not find that they do.

In the General Ribbon Mills case, supra, which held for the taxpayer, no more took place, apart from organizational formalities, than an issuance of stock in exchange for a controlling stock interest in another company whose assets the taxpayer hoped to acquire, after July 1, upon dissolution of the other company. The taxpayer made no disbursements, nor had any receipts. No physical asset useful in the taxpayer's business was acquired and no funds were borrowed. In Mode O'Day Corp. v. Rogan, D.C.S.D. Cal.1940, 32 F.Supp. 571, which likewise was decided in favor of the taxpayer, apart from organizational formalities, no more took place than the making of an agreement to issue stock for property, subject to the approval of the State Commissioner of Corporations. Similarly in

Nicholas v. Colorado Fuel & Iron Corporation, 10 Cir., 1940, 112 F.2d 858, apart from $315 acquired in payment of the directors' qualifying shares, no assets were acquired during the tax year in question.

■ The test which produces consistent results in all the cases cited is whether the taxpayer's activities were confined to perfecting its corporate organization, or whether, its period of legal gestation having been completed, it had actually entered into the world of business. See Cargill, Inc., v. United States, D.C., Del.1942, 46 F.Supp. 712, 714-715.

■ Here the taxpayer after being fully organized and capitalized, borrowed capital and bought property to be used in its manufacturing activity. It is therefore subject to the tax.

Decree for defendant.