## HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* WILSHIRE OIL CO., INC.*

No. 1. Argued October 9, 1939.—Decided November 6, 1939.

---

* See No. 2, *Helvering* v. *Bandini Petroleum Co.* and No. 3, *Helvering* v. *Wilshire Annex Oil Co., post,* p. 512.

*Mr. Arnold Raum,* with whom *Solicitor General Jackson, Assistant Attorney General Clark,* and *Messrs. Sewall Key* and *Ellis N. Slack* were on the brief, for petitioner.

*Mr. Joseph D. Brady* for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case presents the question whether respondent, Wilshire Oil Company, Inc., in computing its net income for the years 1929 and 1930 for the purpose of applying the 50 per cent limitation on depletion allowance under § 114 (b) (3) of the Revenue Act of 1928 (45 Stat. 791), may refuse to take as deductions certain development expenditures,[1] where it has deducted those development

---

[1] These expenditures consisted of such items as labor, fuel and power, materials and supplies, tool rental, truck and auto hire, repairs to drilling equipment and depreciation upon equipment used in drilling.

expenditures in computing its taxable net income for those years. The Board of Tax Appeals held for the respondent (35 B. T. A. 450) and that decision was affirmed by the Circuit Court of Appeals, one judge dissenting (95 F. 2d 971). Because of the importance of the problem of the scope of the Commissioner's rule-making power and because of an asserted conflict of the decision below with the decision of the Circuit Court of Appeals for the Fifth Circuit in *Commissioner* v. *F.H.E. Oil Co.*, 102 F. 2d 596, we granted certiorari.

Respondent is engaged in the business of producing oil and gas from its various properties. In computing taxable net income in its returns for 1929 and 1930 respondent, pursuant to the regulations, deducted development expenditures in the respective amounts of $606,051.66 and $279,927.04. But it refused to make those deductions in determining its "net income . . . from the property" for the same years, when computing allowable depletion under § 114 (b) (3) of the Revenue Act of 1928.[2]

---

[2] For the year 1929 the Commissioner's computations were as follows:

| | | |
|---|---|---|
| Gross Income from the properties | | $1,001,375.17 |
| Deductions: Production expense. | $171,399.03 | |
| Development expense | 606,051.66 | |
| Total expenses | | 777,450.69 |
| Net income from property (computed without allowance for depletion) | | $223,924.48 |
| 50 per cent of that income | | $111,962.24 |

The Commissioner limited the depletion allowance to the last mentioned figure since 50 per cent of the net income from the property as thus computed was less than 27½ per cent of the gross income.

Under the taxpayers computation, the net income for depletion purposes would be $1,001,375.17 less $171,399.03 or $829,976.14 and 50

That section provides:

"In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph."

By virtue of § 23 of the Revenue Act of 1928 companies like respondent were allowed as deductions in computing net income a "reasonable allowance for depletion . . . according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary." Pursuant to that rule-making power the phrase "net income of the taxpayer (computed without allowance for depletion)" as used in § 114(b)(3) was defined by Treasury Regulations 74, Art. 221(i) promulgated under the 1928 Act as meaning "gross income from the sale of oil and gas" less certain deductions including "development expenses (if the tax-

---

per cent thereof would not be less than 27½ per cent of the gross income.

For the year 1930 the Commissioner's computation showed a loss of $194,869.22. He therefore ruled that since the percentage depletion allowance was limited to 50 per cent of the net income from the properties and since the taxpayer had no such net income, no deduction on account of percentage depletion could be allowed. The taxpayer refused, however, to deduct development expenses in the application of the 50 per cent limitation and claimed a depletion deduction of $42,528.91, arrived at as follows:

| | |
|---|---|
| Gross income from the properties | $370,448.72 |
| Deductions: Production expense | 285,390.90 |
| Net Income | $85,057.82 |
| Depletion deduction (50 per cent of net income) | $42,528.91 |

payer has elected to deduct development expenses) . . . but excluding any allowance for depletion." For 1925 respondent, having the option to treat these expenses as deductions for development expenses or as charges to the capital account returnable through depletion,[3] chose the former.

On these facts it would seem that Treasury Regulations 74, Art. 221(i) would require respondent to deduct development expenses in computing "net income" as used in § 114(b)(3), since respondent fell clearly within the class described therein.

But respondent contends that these regulations as applied to it for the taxable years in question are invalid. Its argument runs as follows: (1) The phrase "net income . . . from the property" present in § 114 (b) (3) originated in § 234 (a) (9) of the Revenue Act of 1921 (42 Stat. 227) and was reënacted without change in § 204 (c) of the 1924 Act (43 Stat. 253). It was also carried over into § 204 (c) (2) of the 1926 Act (44 Stat. 9), when Congress adopted the present so-called percentage depletion formula. Shortly after the enactment of the Revenue Act of 1921, Treasury Regulations were issued defining net "income . . . from the property" as meaning gross income from the property less "operating expenses."[4] A similar definition was given in the Treasury Regulations issued under the Revenue Act of 1924.[5] The admitted Treasury practice under those two Acts

---

[3] Treasury Regulations 69, Art. 223, promulgated under the Revenue Act of 1926 provides that "such incidental expenses as are paid for . . . development of the property may at the option of the taxpayer be deducted as a development expense or charged to capital account returnable through depletion. . . . An election once made under the provisions of this article will control the taxpayer's returns for all subsequent years."

[4] Treasury Regulations 62, Art. 201 (h).

[5] Treasury Regulations 65, Art. 201 (h).

was to permit net income from the property to be computed without regard to development expenditures. Hence, respondent argues, the meaning of the phrase "net income . . . from the property" had acquired a plain and definite meaning, known to the Congress; thus when that phrase was reënacted in the 1924 Act, the Congress intended it to have the meaning which administrative practice had given it. And, the argument continues, that meaning having been adopted by the Congress in the 1924 Act, it clung to the same phrase in the 1926 Act[6] and in the 1928 Act, especially since the Commissioner prior to February 15, 1929[7] never did undertake by regulation or decision to give that phrase a meaning different from that which had been consistently applied under the earlier Acts.

(2) Secondly, respondent contends that the fact that it deducted development expenses in computing taxable net income does not mean that it is required to make the same deductions for the "net income" computation under § 114 (b) (3) for the reason that it had no free choice in the first of these computations. In that connection it points out that it was required to make these deductions from gross income by reason of its election in its 1925 return to treat these expenses as deductions for development expenses rather than as charges to capital account returnable through depletion, an election binding for all subsequent years. In that posture of the

---

[6] Respondent points to the Report of Committee on Ways and Means on Revenue Bill of 1926 (H. Rep. No. 1, 69th Cong., 1st Sess., p. 6): "The discovery depletion deduction limitation of an amount not in excess of 50 per cent of the net income of the taxpayer from the property upon which discovery was made, provided in existing law, is retained in this provision."

[7] The date when Treasury Regulations 74, Art. 221 (i), here in question, were promulgated.

case it argues that the attempted change in the regulations here involved has a retroactive effect, as applied to it, and withdraws one of the important inducements offered by the Commissioner in connection with the election which respondent made in its 1925 return.

We do not think that respondent's position is tenable.

As to respondent's claim of retroactivity, it is true that the election made in connection with its 1925 return was known to be binding for all subsequent years. It is likewise true that it was made at a time when Treasury practice did not require deduction of development expenses in making the computation under § 114(b)(3). But that is no basis for a claim of retroactivity. Treasury Regulations 74, Art. 221(i) which required the deduction of development expenses for the purpose of the computation under § 114(b)(3) were issued February 15, 1929 under the 1928 Act. These regulations applied prospectively only and did not purport to reach back to earlier years when the taxpayer relied on a different rule or practice. Tax statutes and tax regulations never have been static. Experience, changing needs, changing philosophies inevitably produce constant change in each. One making an election in the 1925 return took the risk that the method of treatment of depletion might be changed by the Congress, or, where power existed, by the Commissioner. Any other conclusion would make the application of changes pursuant to regulations, though prospective, dependent on fortuitous circumstances under which each taxpayer made such an election. Rigidity, as well as confusion, in administration of tax laws would be the result.

But in this case there is another answer to respondent's claim that an inequity results by changing the regulations after it had made its election in the 1925 return. On June 18, 1927, the Commissioner, with the

approval of the Secretary, issued a Treasury Decision [8]
stating that "In view of the change in the basis for deple-
tion provided by the Revenue Act of 1926, in the case of
oil and gas wells, taxpayers may make a new election
as to the treatment" of development expenditures "for
taxable periods ending on or after January 1, 1925, but
not later than six months after the date of this decision."
Taxpayers desiring to make a new election were required
to file amended returns for the taxable periods involved
within six months from the date of that decision. Thus
respondent, after Congress adopted the new percentage
depletion provision, was afforded ample opportunity to
make a new election. This it did not do. To be sure,
that Treasury Decision contained no notice of any pro-
jected change in the meaning of "net income . . . from
property" as used in § 114 (b)(3). But in September
1927 there issued a General Counsel's Memorandum [9] in
which it was stated that thereafter "if a taxpayer elects
to treat development expenditures as ordinary and nec-
essary business expenses . . . in computing taxable net
income, such expenditures must be deducted in deter-
mining the net income from the property, which amount
is used as a limitation in the computation of the deple-
tion allowance based on income." To be sure, this was
merely an opinion of the General Counsel of the Bureau
and did not have the force or effect of a Treasury Deci-
sion. Yet in view of such ruling, there is now no reason-
able basis for concluding that when respondent made
its second election in 1927 it had no basis for assuming
that the policy as respects "net income . . . from the
property" under the 1926 Act was or would be no differ-
ent than it had been under the 1921 and 1924 Acts.
Therefore, in terms of equitable considerations respond-

---

[8] Treasury Decision 4025, Cum. Bul. VI–1, p. 75.
[9] G. C. M. 2315, Cum. Bul. VI–2, p. 21.

ent has no just ground of complaint. On these facts substantial justice requires that respondent take such burdens as may flow from its election along with the benefits.

Irrespective of these considerations, we think the regulations in question were valid. It is true, as stated by respondent, that the regulations under the 1921 Act provided that the "net income . . . from the property" should be computed for purpose of the depletion allowance without regard to development expenditures. And it may be assumed that that administrative construction received legislative approval by the reënactment of the statutory provision in the 1924 Act, without material change. Cf. *United States* v. *Dakota-Montana Oil Co.*, 288 U. S. 459, 466. But that does not mean that that meaning survived both the 1926 and the 1928 Acts. In the first place, there were no comparable regulations under the 1926 Act.[10] In fact, the Commissioner under-

---

[10] As respects discovery depletion in the case of mines under the 1926 Act, provisions similar to those under the 1921 and 1924 Acts were retained. Treasury Regulations 69, Art. 201 (h). But this was not true as respects oil and gas wells. Section 204 (c) (2) of the Revenue Act of 1926 applied the percentage depletion allowance exclusively to "oil and gas wells." Treasury Regulations 69, Art. 221, provided:

"Under section 204 (c) (2), in the case of oil and gas wells, a taxpayer may deduct for depletion an amount equal to $27\frac{1}{2}$ per cent of the gross income from the property during the taxable year, but such deduction shall not exceed 50 per cent of the net income of the taxpayer (computed without allowance for depletion) from the property. In no case shall the deduction computed under this paragraph be less than it would be if computed upon the basis of the cost of the property or its value at the basic date, as the case may be. In general, 'the property,' as the term is used in section 204 (c) (2) and this article, refers to the separate tracts or leases of the taxpayer."

Thus, it is apparent that the delimitation implied in the permission to deduct "operating expenses" present under the earlier regulations disappeared from the 1926 regulations in case of oil and gas wells.

took under that Act to follow the practice later set forth in the regulations here in question. See *Ambassador Petroleum Co.* v. *Commissioner,* 81 F. 2d 474. Those facts. are of some significance here for they refute the suggestion that the Congress in enacting the 1928 Act was giving approval to an administrative construction which had been given to comparable provisions of earlier Acts but which was abandoned before the passage of the 1928 Act. The more reasonable inference seems to be that reënactment of the provision in question by the 1928 Act at a time when Treasury policy as respects its construction had changed did nothing more than to restore to the phrase "net income . . . from the property" its original ambiguity. Accordingly that phrase became peculiarly susceptible to new administrative interpretation. *Helvering* v. *R. J. Reynolds Tobacco Co.,* 306 U. S. 110; *Morrissey* v. *Commissioner,* 296 U. S. 344.

But in any event, the validity of the regulations in question seems clear. The oft-repeated statement that administrative construction receives legislative approval by reënactment of a statutory provision, without material change (*United States* v. *Dakota-Montana Oil Co., supra*) covers the situation where the validity of administrative action standing by itself may be dubious or where ambiguities in a statute or rules are resolved by reference to administrative practice prior to reënactment of a statute; and where it does not appear that the rule or practice has been changed by the administrative agency through exercise of its continuing rule-making power. It does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers. Cf. *Morrissey* v. *Commissioner, supra,* at p. 355. The contrary conclusion

would not only drastically curtail the scope and materially impair the flexibility of administrative action; it would produce a most awkward situation. Outstanding regulations which had survived one Act could be changed only after a pre-view by the Congress. In preparation for a new revenue Act the Commissioner would have to prepare in advance new regulations covering old provisions. Their effectiveness would have to await Congressional approval of the new Act. The effect of such procedure, so far as time is concerned, would be precisely the same as if these new regulations were submitted to the Congress for approval. Such dilution of administrative powers would deprive the administrative process of some of its most valuable qualities—ease of adjustment to change, flexibility in light of experience, swiftness in meeting new or emergency situations. It would make the administrative process under these circumstances cumbersome and slow. Known inequities in existing regulations would have to await the advent of a new revenue act. Paralysis in effort to keep abreast of changes in business practices and new conditions would redound at times to the detriment of the revenue; at times to the disadvantage of the taxpayer. Likewise the result would be to read into the grant of express administrative powers an implied condition that they were not to be exercised unless, in effect, the Congress had consented. We do not believe that such impairment of the administrative process is consistent with the statutory scheme which the Congress has designed.

The only remaining question is whether Treasury Regulations 74, Art. 221(i) were within the power of the Commissioner to promulgate. That they were seems clear beyond question. We are not dealing here, as was this Court in *Helvering* v. *R. J. Reynolds Tobacco Co.*, *supra*, with regulations applied retroactively. These are

applied prospectively only. The rule-making power here in question may be found in § 23(l) of the Revenue Act of 1928. That section, after providing that companies like respondent were entitled, as a deduction in computing net income, to a "reasonable allowance for depletion . . . according to the peculiar conditions in each case," laid especial emphasis on the power of the Commissioner to make rules for the computation of the depletion allowance, by providing that "such reasonable allowance in all cases is to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary."

Respondent does not strongly urge that the regulatory power conferred by § 23(l) does not extend to the percentage depletion allowance under § 114(b)(3). Rather the contention seems to be that to allow the Commissioner by regulation to change the measure of "net income . . . from the property" from time to time, especially in the manner here attempted, would be to approve a result equally as contrary to the intention of Congress as if he had attempted by regulation to change the percentage factors themselves. But the scope or importance of the change effected by the regulations is immaterial if the power to promulgate such regulations exists. Here the Congress has not prescribed a precise formula free from all ambiguity. The ambiguous phrase "net income . . . from the property" was susceptible of various meanings and hence administrative interpretation of it was peculiarly appropriate, as we have said. And there were special reasons growing out of the complex nature of the depletion problem as it is treated for purposes of the income tax, for requiring the Commissioner to make precise the vague elements of that formula. In its general aspects under revenue acts depletion is a problem on which taxpayers, government and accountants

have expressed a contrariety of opinions.[11]   Obfuscation in attempted application of its principles under income tax laws has frequently been the result.   The Congress itself, as revealed in the history of the revenue acts, has expressed varying philosophies.   In practical administration of any one statute there are admittedly borderline cases between deductible business expenses and non-deductible capital outlays.   On specific fact situations the clear line between depletion, depreciation, and obsolescence often becomes blurred.[12]   What those lines are or should be is for the Congress and the Commissioner.   Experience and new insight can be expected to produce rather constant change.   In sum, the highly technical and involved factors entering into a practical solution of the problem of depletion in administration of the tax laws points to the necessity of interpreting § 23(l) so as to strengthen rather than to weaken the administrative powers to deal with it equitably and reasonably.   These considerations are persuasive here not only in reaffirming the conclusion that the rule-making power existed, but also in concluding that restrictions on that power should not be lightly imposed where the incidence of such rules as are promulgated is prospective only.

*Reversed.*

MR. JUSTICE BUTLER and MR. JUSTICE REED took no part in the consideration or decision of this case.

---

[11] 2 Paul & Mertens, The Law of Federal Income Taxation (1934), ch. 21; 47 Yale L. Journ. 806 (1938).

[12] See for example the issues posed in *United States* v. *Dakota-Montana Oil Co., supra.*