**DOW CHEMICAL CO. v. KAVANAGH, Collector of Internal Revenue.**

No. 9449.

Circuit Court of Appeals, Sixth Circuit.

Nov. 30, 1943.

R. M. O'Hara, of Detroit, Mich. (R. M. O'Hara, of Detroit, Mich., and Royal T. McKenna, of Washington, D.C., on the brief), for appellant.

Irving Axelrod, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, Samuel H. Levy, and N. Barr Miller, all of Washington, D. C., and John C. Lehr and Arnold W. Lungerhausen, both of Detroit, Mich., on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The determinative question upon this appeal from judgment in a trial to the court without a jury, is whether the purchase by the appellant corporation of shares of its own stock and their subsequent sale at a price exceeding their cost, was a taxable transaction under the Revenue Act of 1934 and § 22(a) 16 of Regulations 86 approved February 11, 1935. The appellant asserted it to have been a capital transaction and so non-taxable, but the court disagreed and dismissed its suit for refund.

At the beginning of its fiscal year, on June 1, 1933, the appellant owned 335 shares of its own common stock which remained from purchases in the calendar year 1932. In 1933 it learned that many of its stockholders, on account of the depression, were in distress in respect to their stock were pledged as security for loans, and were threatened with loss of their stock investment. In addition to other efforts in aid of its stockholders, the appellant, from September 26, 1933, to March 23, 1934, purchased approximately 4,700 shares of its common stock at current market prices pursuant to authority of its Board of Directors. The authority was granted and exercised, it is asserted, only because the corporation had excess capital not required in business operations, and wished to reduce its capital obligations. This it did not only by purchase of its common stock, but by discharging its bank loans and paying sinking fund notes in advance of maturity.

On July 2, 1934, the appellant held 5,035 shares of its common stock, consisting of the 335 shares remaining of its 1932 purchases, and 4,700 shares purchased in 1933 and 1934. On that date it paid a 50% stock dividend upon all of its common stock thus increasing its holding of its own stock to 7,553 shares. This was reduced in August, 1934, by the sale of 267 shares to its transfer agent to enable it to supply fractional shares to round out the holdings of its stockholders who had received fractional shares through the stock dividend. The remaining 7,286 shares it continued to hold until March, 1936.

During 1935 the appellant found itself in need of additional capital to finance an expansion program, consisting of additions to plant and further investments in subsidiaries which extended or supplemented its own operations. To meet this need it sold, in March, 1936, the 7,286 shares of its common stock through a New York brokerage house at $107 per share, paying a commission of $2 per share. The sales were made through private offerings to a limited number of purchasers upon their representation that they were purchasing the shares for their own account for the purpose of investment and not for distribution. The sales were made at about $10 below quotations on its stock on the Cleveland Stock Exchange and the New York Curb Exchange.

When the stock was bought, the certificates were taken in the name of Pardee, one of its officers and directors as nominee, who immediately endorsed the certificates in blank and they were then placed in appellant's vaults. During the entire period of ownership the shares were carried on its books as an asset, together with other investments in corporate securities. None of the shares were retired and the number of shares of common stock outstanding was not altered by reason of the purchase. The shares were carried on the books at cost.

When cash dividends on outstanding stock were declared, the trust company, which handled dividends for the appellant, drew its checks to the order of Pardee in whose name the shares were registered, and delivered them to Pardee who endorsed them and turned them over to the appellant's treasurer. The amounts were then entered upon the appellant's books. Not till the end of the year were the amounts so received replaced by appellant in its dividend account with a corresponding charge against income.

Section 22(a) of the 1934 Act, 26 U.S. C.A.Int.Rev.Acts, page 669, is substantially identical with corresponding sections of all of the Revenue Acts back to the 1918 Act, and defines gross income to include, inter alia, "gains or profits and income derived from any source whatever." Under each of the Revenue Acts from 1918 to 1932, inclusive, the Treasury regulation in respect to the acquisition or disposition by a corporation of its own stock, was as follows: "The proceeds from the original sale by a corporation of its shares of capital stock, whether such proceeds are in excess of or less than the par value of the stock issued, constitute the capital of the company. If the stock is sold at a premium, the premium is not income. Likewise, if the stock is sold at a discount, the amount of the discount is not a loss deductible from gross income. If, for the purpose of enabling a corporation to secure working capital or for any other purpose, the shareholders donate or return to the corporation to be resold by it certain shares of stock of the company previously issued to them, or if the corporation purchases any of its stock and holds it as treasury stock, the sale of such stock will be considered a capital transaction and the proceeds of such sale will be treated as capital and will not constitute income of the corporation. A corporation realizes no gain or loss from the purchase or sale of its own stock. (Article 542 of Regulations 45 [R. A. of 1918]; Article 543 of Regulations 62, 65 and 69 [R. A. of 1921, 1924 and 1926]; Article 66 of Regulations 74 and 77 [R. A. of 1928 and 1932])."

In 1934, however, this regulation was superseded by Treasury Decision 4430, which on February 11, 1935, became Article 22(a) 16 of Regulations 86. It reads: "Art. 22(a)-16. Acquisition or Disposition by a Corporation of its Own Capital Stock.—Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. The receipt by a corporation of the subscription price of shares of its capital stock upon their original issuance gives rise to neither taxable gain nor deductible loss, whether the subscription or issue price be in excess of, or less than, the par or stated value of such stock.

"But if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. So also if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a deduction where permitted by the provisions of the Act."

It will be observed that the earlier regulation treated all transactions by a corporation in its own stock as capital transactions, giving no rise to income. The amended regulation of 1934, however, makes taxability of such transactions depend upon their facts and circumstances, and declares such transaction taxable if the corporation dealt in its own shares as it might have done in the shares of another corporation. But the earlier regulation had stood unchanged from 1918 to 1934, and therefore it is now contended that it had become so embedded in the law by reason of the re-enactment of § 22(a) of successive Acts, that the Congress alone, by specific provision, was empowered to supersede or modify it.

It will be noted that there is here no question of giving retroactive application to the amended regulation so as to make taxable transactions which were not taxable before it was promulgated, as was the case in Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L. Ed. 536. The regulation here in question was approved in 1935 as interpretative of the 1934 Act, and the gain alleged to be taxable was realized in 1936. In the cited case the Supreme Court specifically refrained from determining whether the al-

teration of an existing rule, even for the future, requires a legislative declaration or may be shown by re-enactment of the statutory provision unaltered after a change in the applicable regulation. If, however, there is an implication in the argument used in the Reynolds case, that an amended regulation is to be considered effective only after the Congress has reenacted the provision sought to be interpreted, without change, the inference is definitely destroyed by the more recent cases of Helvering v. Wilshire Oil Co., 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101, and Helvering v. Reynolds, 313 U.S. 428, 61 S.Ct. 971, 85 L.Ed. 1438, 134 A.L.R. 1155.

In the Wilshire Oil Co. case [308 U.S. 90. 60 S.Ct. 24, 84 L.Ed. 101] it was said: "The oft-repeated statement that administrative construction receives legislative approval by reenactment of a statutory provision, without material change * * * covers the situation where the validity of administrative action standing by itself may be dubious or where ambiguities in a statute or rules are resolved by reference to administrative practice prior to reenactment of a statute; and where it does not appear that the rule or practice has been changed by the administrative agency through exercise of its continuing rule-making power. It does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers."

In Helvering v. Reynolds, supra [313 U.S. 428, 61 S.Ct. 973, 85 L.Ed. 1438, 134 A.L.R. 1155], the rule that Congressional approval of an interpretative regulation is implied from the re-enactment of a statutory provision without change, is said to be "no more than an aid in statutory construction. * * * it does not mean that the prior construction has become so embedded in the law that only Congress can effect a change. * * * It gives way before changes in the prior rule or practice through exercise by the administrative agency of its continuing rule-making power." While each of the above cases may be distinguished from the instant case on the facts, the language is so unequivocal in respect to the limits of the rule interpreting Congressional re-enactment as approval of administrative rule or practice, that we are required to hold the 1934 regulation applicable to the corporate transaction here involved.

There remains then the contention so vigorously urged upon us by the appellant, that the new regulation was incorrectly interpreted by the District Judge. It is contended that no change in the old rule was made, but that the new regulation was mere clarification in response to a judicial interpretation of its terms stemming from Commissioner v. S. A. Woods Mach. Co., 1 Cir., 57 F.2d 635, wherein it was said that whether the acquisition or sale by a corporation of its own capital stock gives rise to taxable gain or deductible loss, depends upon the real nature of the transaction involved, and that where a corporation has legally dealt in its own stock as it might in the shares of another corporation, no sufficient reason appears why gain or loss should not be taken into account in computing taxable income, notwithstanding the more liberal terms of the then applicable regulation. Commissioner v. Boca Ceiga Development Co., 3 Cir., 66 F.2d 1004; Dorsey Co. v. Commissioner, 5 Cir., 76 F.2d 339, and in this circuit, Allyne-Zerk Co. v. Commissioner, 6 Cir., 83 F.2d 525, applied the doctrine of the Woods case where the transaction was clearly not capital readjustment but a gain from the sale of property, or the receipt by a corporation of its own stock in settlement of a suit or in payment of other obligations. In such cases the fair market value of the stock received must be included in the amount realized for the purpose of ascertaining gain or loss.

But it is argued that where stock is acquired for cash and so reduces the corporate capital stock obligation, and then sold for cash, and neither its purchase nor sale is an element of another transaction reflecting profit or loss, the whole operation is merely an adjustment of capital and stands upon the same tax basis as an original issue of stock. The Board of Tax Appeals (now the Tax Court of the United States) was doubtless impressed with this view in various decisions. National Home Owners' Service Corp. v. Commissioner, 39 B. T. A. 753; Dr. Pepper Bottling Co. v. Commissioner, 1 T.C. 80; Brockman Oil Well Cementing Co. v. Commissioner, 2 T.C. 168, and several District Court decisions, were also influenced by it. Stern Bros. & Co. v. United States, D. C., 45 F. Supp. 583; Investment Corporation of Philadelphia v. United States, D. C., 43 F.Supp. 64. However, the Circuit Courts of Ap-

peals in the Second, Fifth and Eighth Circuits have all held the new regulation to have made a real change in the law, and that the only question is whether the corporation has dealt in its own shares as it might have dealt in those of another corporation without regard to decisions interpreting the earlier rule. Allen v. National Manufacture & Stores Corp., 5 Cir., 125 F. 2d 239; Commissioner v. Air Reduction Co., 2 Cir., 130 F.2d 145; Helvering v. Edison Bros. Stores, 8 Cir., 133 F.2d 575; Brown Shoe Co. v. Commissioner, 8 Cir., 133 F.2d 582. It is true that some of these cases may be distinguished on their facts, the cases in the Fifth and Second Circuits involving sales of treasury stock to employees. This purpose, as pointed out by Judge Learned Hand in dissenting from Commissioner v. Air Reduction Co., supra, could, of course, not have been served by purchasing the stock of other corporations. Insofar as such cases may thus be distinguished, the distinctions are of little aid to the appellant since the facts in the present case point more strikingly to its dealing in its own shares as it might have dealt in the shares of another corporation, and it is doubtful that the taxability of the present transaction would have received Judge Hand's condemnation, in view of his understanding that Helvering v. Reynolds, supra, recognizes such shares as property of the corporation, like the shares of another corporation.

■■ We are not required to go so far as to hold with the District Judge that every transaction by a corporation in its own shares other than their original issue, is taxable, for in the present case it is difficult to perceive in what material respect the shares here involved would otherwise have been treated had they been the shares of another corporation. They were purchased on the open market, were designated on the books of the appellant as an asset, were carried at cost on its balance sheet as investments in stock of domestic corporations, were not retired, were taken in the name of one of its officers and endorsed by him in blank, participated in a stock dividend, and until balanced by bookkeeping entries were credited with cash dividends, and sold through brokers without according stockholders the usual priorities accorded them on the issue of treasury stock. The District Court found, upon evidence that appears substantial, that the appellant regarded an investment in its own shares to be a matter of good business and likely to result in gain or profit. The holding of the certificates by the appellant in its vaults, endorsed in blank so that they might conveniently be transferred by delivery whenever conditions should make their sale desirable or profitable, and so avoiding the mechanics and the necessity of administrative authority for the issue of new shares, lends support to the view that the corporation envisioned their sale at some future time for profit. The asserted motive for the transaction is of less importance in determining its essential character than is the manner of its accomplishment.

It seems perfectly clear that the appellant, having idle funds not needed in its operations, and knowing the value of its own stock, did what any other prudent investor would have done,—bought it when its price was low. It may be important, though inconclusive, that it also had a purpose to relieve distressed stockholders and temporarily reduce capital obligations. It clearly realized a substantial profit through dealing in its stock as though it were the stock of another corporation and the gain was taxable, under the law and regulations.

The judgment is affirmed.