Rialto Mining Corporation v. Commissioner.
Rialto Mining Corp. v. Commissioner
Docket Nos. 6978, 8083.
United States Tax Court
1946 Tax Ct. Memo LEXIS 157; 5 T.C.M. (CCH) 519; T.C.M. (RIA) 46148; June 25, 1946
Tom F. Carey, C.P.A., 1103 Colcord Bldg., Oklahoma City, Okla., for the petitioner. Frank B. Schlosser, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The respondent determined deficiencies in petitioner's income taxes of $1,582.94 and $9,317.28 for 1940 and 1942, respectively. Petitioner claims an overpayment of $4,051.32 in income taxes for 1940 and an undisclosed amount for 1942. The issues involved in the proceedings and for our consideration are: 1. Did respondent err in not allowing the petitioner a deduction from income for the year 1940 in the amount of $946.72 and for the year 1942 in the amount of $4,800.75, both amounts representing expenditures in connection with certain mining *158 claims located in Arizona? 2. Whether or not petitioner sustained a deductible loss in the year 1940 arising out of the rejection of its application for a patent on or abandonment of certain mining claims in the State of Arizona? 3. Did respondent err in not allowing a deduction from income for the year 1942 in the amount of $721.73, the amount representing expenditures in connection with the Carl Junction property in the State of Missouri. 4. Did respondent err in restoring to income the amount of $1,478.93, consisting of the difference between $1,820.31, the amount allowed by respondent for 1939 Oklahoma income taxes in settlement of petitioner's Federal income tax liability for 1939, and $341.38, the amount actually paid to the State of Oklahoma in 1942? 5. Did respondent err in his computation of the allowable depletion for the year 1942 by treating petitioner's two mines or shafts as separate properties? 6. Did respondent err in his computation of the allowable depletion for the year 1942 by deducting from gross income the amount of a National Labor Relations Board settlement paid in 1942 which covered wages for prior years, in arriving at the net income subject to the *159 50 per cent limitation? 7. What sum is petitioner entitled to deduct in the year 1942 for Oklahoma income taxes? Other issues raised by the pleadings were abandoned at the hearing or conceded upon brief. The proceedings have been consolidated. From evidence both documentary and oral, we make the following. Findings of Fact [1]
General Facts The petitioner, Rialto Mining Corporation, is a corporation organized under the laws of the State of Delaware, December 25, 1925, and is engaged in mining lead and zinc ores, with its principal place of business at Picher, Oklahoma. Petitioner keeps its books and files its returns on an accrual basis. The returns for the taxable years were filed with the collector of internal revenue for the district of Oklahoma, Oklahoma City. I. Deductibility of expenditures from gross income on mining claims located in Arizona II. Deductibility of loss arising out of rejection of application for patent on or abandonment of certain Arizona claims Findings of Fact (On first two issues) On December 31, 1925, petitioner *160 acquired from A. G. Hull, its president and principal stockholder, 15 contiguous Arizona lode mining claims, having a total area of 295.87 acres, known (and hereafter referred to) as the Castle Dome group. An application for patent on the claims of the Castle Dome group was filed under the name of Albert Gregory Hull on January 24, 1939. Under date of August 8, 1939, the General Land Office of the Department of Interior notified Hull that his application, in so far as it related to the six claims, Chief of the Dome Nos. 1, 2, 3, 4, and 5, and Hull No. 5, was being rejected for lack of discovery of mineral deposits of value. Thereafter, and by an instrument dated August 28, 1939, Hull withdrew his application on these six claims, without waiving or relinquishing any right, title and interest he might have to the claims. Sufficient work had been done to cover the entire six claims, but notice of affidavit of assessment work was filed in June 1940 on only two of the claims, Chief of the Dome Nos. 3 and 5, having an area of 41.322 acres, which had been rejected. No notice of affidavit of assessment work was filed on the remaining four claims, Chief of the Dome Nos. 1, 2, 4, and Hull *161 No. 5, having an area of 82.644 acres, which had been rejected. The filing of notice was done under the instructions of Sam Ashe, an officer of the petitioner. During the period from June 30, 1940, to the early part of 1945, neither the petitioner nor any of its officers asserted any claim or right to the four claims above mentioned on which no notice of affidavit of assessment work was filed. However, early in the year 1945 Hull, the official head of petitioner, relocated on them. At the date of the hearing of this case, all 15 of the claims were under lease on a royalty basis. On January 3, 1940, petitioner was granted a patent on the following nine claims of the Castle Dome group: Diana, Soprise, Lorina, Lucinda, Chief of Dome, Hull Nos. 2, 3, and 4, and Barkley. These claims had a total area of 171.904 acres. Development work on the claims commenced in 1927 and, while not actually done on all 15 of the claims, all of them received the benefit of the assessment work. The principal shaft was on the Diana claim and was an expensive development. There was approximately 2,000 feet of drifts. Very little development was done on the six claims for which the application for patent *162 was rejected and later withdrawn. Prior to 1940, petitioner had expended the sum of $244,902.59 in the acquisition and development of the Castle Dome properties. During the year 1940, petitioner expended the sum of $946.72 and for the year 1942 the sum of $4,800.75 on the Castle Dome properties, in varying amounts on the following: labor, gas and oil, greases, garage bill, miscellaneous supplies, compensation, insurance, other insurance, and recording. Because of transportation difficulties and the inability to obtain equipment, the Castle Dome properties were not operated in 1940, nor was there any commercial production in that year or in 1942. Opinion I. Respondent should be and is sustained in excluding petitioner's deduction from gross income of the amounts expended on the mining claims located in Arizona for the years 1940 and 1942. Petitioner argues that the Arizona property was fully developed at the end of 1939 and as proof of the fact relies on the testimony of one Fries who made such a statement. The reasons for there being no sales during 1940 and 1942 were the war, distance to market and the lack of manpower and equipment, all of which, says the petitioner, caused *163 the property to lie dormant during this period. Petitioner further says the expenditures here considered are deductible under section 23 (a) (1) of the Internal Revenue Code in that they are "ordinary and necessary expenses" and that section 19.23 (a) (1) of Regulations 103 is controlling. However, as pointed out by respondent, the primary consideration must be given to the fact as to whether the mining claims had passed from the development stage to that of a producing status. This is necessary because all expenditures before such producing period must be capitalized. The regulation found in section 19.23 (m)-15, Regulations 103 [2] covers determination whether a mine has passed from a development stage to that of a producing status. It is true that witness Fries testified that the property was fully developed at the end of 1939 but according to the regulation the mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather *164 than the development of additional ores for mining. Petitioner has made no factual showing that he comes within either of the above provisions. It is evident that the clear intention is to require certain standards to be met before a mine can be considered to have passed from a development stage to that of a producing status. II. Petitioner is not shown to have sustained deductible loss in the year 1940 arising out of the rejection of its application for a patent on certain mining claims in the State of Arizona. In the instrument withdrawing the six claims from *165 the application for the patent, petitioner explicitly stated that it was not relinquishing any rights to the claims; therefore, it can not be said that there was any loss in connection with the rejection of its application for a patent. Such a reservation of rights in the withdrawal of an application has been upheld in Miller v. Hamley, 74 Pac. 980; 31 Colo. 495, where it was said in substance, the locator of a lode claim, by applying for and obtaining patent for only part of the location, including the discovery shaft, does not thereby abandon the portion not included in the patent. Though originally predicating loss on denial of application for patent on six claims, petitioner now bases loss on abandonment of four claims, namely, Chief of the Dome Nos. 1, 2 and 4, and Hull No. 5. It is stated in 1 American Jurisprudence 39, page 7, that: * * * the mere relinquishment of possession of a thing is not an abandonment of it in a legal sense of the word, for such an act is not wholly inconsistent with the idea of continuing ownership. Abandonment consists of two elements - act and intention. * * * This same theory of abandonment appears to be the law in Arizona *166 as stated in Peachy v. Frisco Gold Mines Co., (D.C. Ariz.) 204 Fed. 659, 668: "The term 'abandonment,' as used in mining law, includes both the intention to abandon and the act by which the abandonment is carried into effect." The only testimony that we have as to the petitioner's intention to abandon the claims is that of one Fries, superintendent of the Arizona properties wherein he said that he had filed proof of assessment work on only two of the six claims that had been rejected in the application for patent (the other four being the ones claimed to be abandoned) and that he was acting under instructions of Sam Ashe, who was an officer of the petitioner, but it is not shown what office Ashe held, and in other testimony this witness ties this statement in with his theory of abandonment where he says: "Why, notice of affidavit of assessment work was filed there in-1940, in June, I believe, leaving out four of the claims. I don't know any other way to say it than that they were abandoned, * * *". Often the question of intent can be determined as to what transpires at the time and after the alleged action. The application for a patent was made in the name of Hull but *167 was for the petitioner. In 1945, we see Hull relocating on the four claims that were supposed to be abandoned by the petitioner in 1940. In Shank v. Holmes, 137 Pac. 871, 875; 15 Arizona 229, it was said: An abandonment of claims held by location takes place where the locator voluntarily leaves his claim to be appropriated by another, without any intention of again claiming it in the future; * * *." (Italics ours.) In the definition of abandonment, above, it is stated that there must be shown some act of abandonment. In the instant case there is no such showing but rather the mere statement of conclusion that the claims were abandoned. In Buffalo Zinc & Copper Co. v. Crump, 69 S.W. 572, 576; 70 Ark. 525, it was said, "To constitute an abandonment, there must be an absolute desertion of the premises. The burden of proving it is upon him who asserts it." If petitioner did have an intention to abandon the four claims in 1940, which would be difficult to say from the evidence, it would be minimized by the fact that Hull relocated on them in 1945 and more especially since Hull owned 90 per cent of the stock of petitioner; also previously *168 sold his rights, title and interest in the claims to petitioner and furthermore filed the application to get a patent for petitioner in his own name. The 15 claims, at the date of the hearing of this case, were under lease on a royalty basis and in the statement concerning this testimony there was no mention of any segregation as to ownership. In view of such evidence and Hull's previous connections with the petitioner, it appears that he may still be acting the petitioner. This conclusion in view of no evidence to the contrary is as logical as it would be to say his actions in relocating on the four claims was for his own benefit. In view of the Buffalo Zinc & Copper Co. v. Crump case, that the burden of proving abandonment is upon him who asserts it, we note that there is no showing of any acts on the part of petitioner of removing any of its indicia of ownership whereby the outside world would know that the four claims that were allegedly abandoned were open for any one to relocate on them. We hold that no error by the Commissioner is shown on this point. III. Deductibility of expenditures in connection with the Carl Junction property Findings of Fact During the year *169 1942, petitioner expended the sum of $721.73 in connection with its Carl Junction mining property in the State of Missouri, itemized as follows: Labor $441, supplies $105.73 and rent $175. Opinion The Commissioner did not err in not allowing a deduction from income for the year 1942 in the amount of $721.73, the amount representing expenditures in connection with the Carl Junction property in the State of Missouri. There is no doubt but this is mining property but there is no evidence as to its progress of development, whether fully developed, being abandoned or some other stage of development, and therefore whether the expenditure is capital or otherwise. As was discussed under the first issue of this case, this expenditure would fall under section 19.23 (m)-15, Regulations 103 - hence for the failure of proof on the part of petitioner the respondent should be upheld since his determination is presumed correct until proved otherwise. IV. Restoring to income the difference in amount of Oklahoma income tax accrued in 1939 and the amount actually paid in 1942 Findings of Fact For the taxable year 1939, petitioner was allowed to deduct an accrual of $1,820.31 for Oklahoma *170 income tax. On February 27, 1942, petitioner's 1939 Oklahoma income tax liability was settled with the Oklahoma Tax Commission for $341.38, representing $302.89 for tax liability, and $38.49 for interest. Opinion Respondent did not err in restoring to income the amount of $1,478.93, consisting of the difference between $1,820.31, the amount allowed by respondent for 1939 Oklahoma income taxes in the settlement of petitioner's Federal income tax liability for 1939, and $341.38, the amount actually paid to the State of Oklahoma in 1942. Petitioner bases its case primarily on Greene Motor Co., ( 1945) 5 T.C. 314. However, this case is distinguishable from the instant case in that the court said: "he [respondent] apparently makes no contention that the amounts deducted as such reserves were income in 1939. [Respondent there was attempting to tax an amount in 1939 that was charged off as a reserve in 1938.] He attempts to justify his action, rather, on the ground that if the erroneous deductions are not included in petitioner's gross income for 1939, they will never be taxed." In the instant case there is showing of a particular time for the inclusion of the amounts *171 in income, and incidence of taxation thereon, that time being the year of settlement of the 1939 Oklahoma income tax, and the payment of the tax, in 1942. In our opinion the instant case falls within the rule followed in the Hoboken Land & Improvement Co. case, 46 B.T.A. 495 [Dec. 12,440], appealed and affirmed on other grounds (C.C.A.-3, 1943), 138 Fed. (2d) 104, and we hold that the amount here in question, $1,478.93, is taxable income of the petitioner in the year 1942. The above-mentioned Hoboken case was decided on facts very similar to the facts of the instant case except that there it was the accruing of real estate taxes instead of income taxes as in the instant case. Our attention has been called to certain exceptions to the above principle such as there being a loss in the year the item was accrued, insolvency of petitioner, or consideration passing between taxpayer and the other party, but none of these apply to the instant case. The respondent's position is affirmed. V. Should petitioner's property in Ottawa County, Oklahoma be treated as separate properties in 1942 Findings of Fact For a number of years prior to and including 1942, *172 petitioner was engaged in mining ores from a 200 acre tract of land situated in Ottawa County, Oklahoma. During the period from 1935 to July 14, 1938, the ores were obtained through shaft No. 2. From July 15, 1938, to December 27, 1940, there were no underground operations and only tailings were reworked during this period. On December 27, 1940, operations for the removal of ore were first commenced in shaft No. 3. However, the ground underneath this shaft had been operated through shaft No. 2 prior to July 15, 1938. Petitioner's underground mining operations since December 27, 1940, are carried on without regard to property lines other than the outside boundaries limiting the area of petitioner's property. Separate accounts are kept in petitioner's books for shaft No. 2 and shaft No. 3 and the income and expenses applicable to each are reflected therein. The account for shaft No. 3 was started in December 1940. In the determination of the deficiency for 1942, respondent held that shaft Nos. 2 and 3 were separate properties and computed a statutory depletion for each. Respondent also deducted from the gross income of each shaft an aliquot part of the $23,872.42, representing the *173 amount paid in 1942 as back wages under a National Labor Relations Board settlement (considered more in detail under the next issue), in arriving at the net income subject to the 50 per cent limitation for depletion purposes. Opinion Respondent erred in his computation of the allowable depletion for the year 1942 by treating petitioner's two mines or shafts as separate properties. Respondent relies completely upon The Black Mountain Corporation case, 5 T.C. 1117, in which it was held that petitioner had two properties for the purpose of computing percentage depletion under section 114 (b) (4) of the Internal Revenue Code. [3] However, the facts in that case are substantially different from those in the instant case. There, two mines were located approximately one and one-quarter miles apart. Each had its own complete facilities such as office, store, houses for the workmen, railroad siding, etc. Also, each had a separate superintendent and chief clerk. All records of each mine were kept separately and the mines were treated as separate units in all ways by the petitioner. The petitioner made various reports to the State and Federal authorities *174 for each mine. In the instant case there is little evidence on any of these points. It is clearly shown, however, that petitioner considered the 200 acre tract as one property, since before shaft or mine No. 3 was completed the entire underground operation came through shaft or mine No. 2; while in the taxable year it could come through either. Workmen may go down one shaft and the result of their labor may come up through the other. That accounts were separately kept for each shaft seems unimportant. The underground operation is so interwoven that in our view it is impossible to say that there were two mines. The Black Mountain Corporation case, supra, does not control. *175 Petitioner points out that the Regulations G.C.M. 24094, 1944 C.B. 250, which modified and further developed G.C.M. 22106, 1941-1, C.B. 245, defines the word "property" in such a way that its 200 acre tract can be considered a single property. The aforementioned regulation cites an example that very closely resembles the instant case and holds there that the tract may be considered a single property and in so doing indicates that the operations such as petitioner's may be treated as a single property. We sustain the petitioner on this issue. VI. Should the gross income for 1942 be reduced by the amount of the settlement of the National Labor Relations Board in computing the allowable depletion Findings of Fact August 3, 1942, petitioner paid back wages in the amount of $23,872.42 in accordance with a National Labor Relations Board settlement. The amount represented back pay awards applicable to the different years, as follows: 1935 - $1,952.22; 1936 - $4,201.59; 1937 - $3,869.50; 1938 - $3,676.50; 1939 - $3,676.47; 1940 - $3,501.09, and 1941 - $2,995.05. Opinion The statute, section 114 (b) (4) of the Internal Revenue Code *176 , limits the allowance for depletion as to a metal mine, to 50 per cent "of the net income * * * from the property." Petitioner contends that the respondent erred in deducting from its gross income from the property the amount of a National Labor Relations Board settlement paid in 1942 which covered wages for prior years, in order to arrive at net income therefrom in computing percentage depletion under the provisions of section 114 (b) (4), maintaining that the payment of the wages for the prior years did not relate to the production of ores in 1942. The petitioner's position here is similar to that of the petitioner in Montreal Mining Co., 41 B.T.A. 399, and Holly Development Co., 44 B.T.A. 51, and the respondent in Helvering v. Wilshire Oil Co., 308 U.S. 90. In these cases the taxpayer took as deductions in the taxable year expenses which were incurred in prior years. Such expenses had no direct relation to the production from the taxpayer's property during the taxable years. So here the settlement for the wages for prior years had no direct relation to the current year's output but they grew from and had an immediate relation to the petitioner's *177 mining operations and arose out of the interest in the mineral property owned by the taxpayer. The payment of the wages for the prior years here must be placed in the same category as the silicosis claims in the Montreal Mining Co. case or the interest in the Holly Development Co. case or the development expenses in the Wilshire Oil Co. case, in all of which it was held that the particular expense was required to be deducted from gross income in computing "net income from the property" for depletion purposes. In line with and upon the authority of the above decisions, with a close examination of section 19.23 (m)-1 (g) and (i), Regulations 103, [4] we sustain the respondent. *178 VII. Sum petitioner is entitled to deduct for 1942 Oklahoma income taxes Findings of Fact Petitioner deducted $6,873.92 for 1942 Oklahoma income tax in its 1942 Federal return filed September 15, 1943. Respondent in the deficiency notice dated February 21, 1945, allowed $2,250.21 for 1942 Oklahoma income tax, denying deduction of $4,623.71. During the year 1943 petitioner paid Oklahoma income taxes for the year 1942 in the amount of $1,500. In the petition it is alleged that the Commissioner erred in understating the deduction for Oklahoma income taxes for the year 1942, in the amount of $4,623.71, and the prayer asks that the deduction for Oklahoma income taxes paid for 1942 be increased by $4,623.71 or more. The answer is a general denial as to this point. However, in his reply brief the respondent urges that as only $1,500 tax was paid, the deduction previously allowed of $2,250.21 should be reduced to $1,500, and net income accordingly increased. Opinion In our opinion the respondent should be sustained on this point. The petitioner in his brief on this issue says: The question of the taxability of U.S. War Production Board bonuses by the State of Oklahoma has not *179 yet been determined and the taxpayer's final Oklahoma tax liability thereon for the year 1942 is therefore unknown at this time. It may be either more or less than the amount accrued and deducted for 1942. At the trial this situation was discussed at length by counsel; the statement made by petitioner's counsel that the allowance of deduction of $2,250.21 for Oklahoma taxes was not correct for 1942, but an adjustment for 1941; and testimony was taken that the amount of tax actually paid for 1942 was only $1,500. We think it was understood then between counsel that the deduction to be considered and allowed should be the amount proven, $1,500. Amendment to the pleadings to set up any increased deficiency as to the item should not, under such circumstances, be required. Decision will be entered under Rule 50. Footnotes
1. The facts on each issue (except general facts) will be set forth separately, followed by the opinion on that issue or issues.↩
2. Regulations 103. Sec. 19.23(m)-15. Allowable capital additions in case of mines. - (a) All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.↩
3. SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. * * *
(b) Basis for Depletion. - * * *
(4) Percentage Depletion for Coal, Fluorspar, Flake Graphite, Vermiculite, Beryl, Feldspar, Mica, Talc, Lepiodolite, Spodumene, Barite, Ball and Sagger Clay, Rock Asphalt, and Metal Mines, Potash, and Sulphur. - (A) In General. - The allowance for depletion under section 23(m) shall be * * * in the case of metal mines, fluorspar, flake graphite, vermiculite, beryl, feldspar, mica, talc, lepidolite, spodumene, barite, ball and sagger clay, or rock asphalt mines, and potash mines or deposits 15 per centum, * * * of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph. (B) Definition of Gross Income From Property. - As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining", as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term "ordinary treatment processes", as used herein, shall include the following: * * * (iii) in the case of iron ore. bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product - sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product - crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores. * * *↩
4. SEC. 19.23(m)-1. - DEPLETION OF MINES, OIL AND GAS WELLS, OTHER NATURAL DEPOSITS, AND TIMBER; DEPRECIATION OF IMPROVEMENTS. - * * *
(g) "Net income of the taxpayer (computed without allowance for depletion) from the property," as used in section 114(b)(2), (3), and (4) and sections 19.23(m)-1 to 19.23(m)-28, inclusive, means the "gross income from the property" as defined in paragraph (f) of this section less the allowable deductions attributable to the mineral property upon which the depletion is claimed and the allowable deductions attributable to the processes listed in paragraph (f) in so far as they relate to the product of such property, including overhead and operating expenses, development costs properly charged to expense, depreciation, taxes, losses sustained, etc., but excluding any allowance for depletion. Deductions not directly attributable to particular properties or processes shall be fairly allocated. To illustrate: in cases where the taxpayer engages in activities in addition to mineral extraction and to the processes listed in paragraph (f), deductions for depreciation, taxes, general expenses, and overhead, which cannot be directly attributed to any specific activity, shall be fairly apportioned between (1) the mineral extraction and the processes listed in paragraph (f), and (2) the additional activities, taking into account the ratio which the operating expenses directly attributable to the mineral extraction and the processes listed in paragraph (f) bear to the operating expenses directly attributable to the additional activities. If more than one mineral property is involved, the deductions apportioned to the mineral extraction and the processes listed in paragraph (f) shall, in turn be fairly apportioned to the several properties, taking into account their relative production. * * *
(i) "The property," as used in section 114(b)(2), (3) and (4)↩ and sections 19.23(m)-1 to 19.23(m)-19, inclusive, means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property"; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property", provided such treatment is consistently followed.